# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

-----------------------------------------------------------------X

| | |
|---|---|
| IN REM TAX FORECLOSURE ACTION NO 52<br>BOROUGH OF BRONX | Index Number<br>40000/2015 |
| SECTIONS 9, 10, 11, 12, 14, 15 and 16<br>TAX CLASSES 1 and 2 | **AFFIRMATION IN REPLY AND IN FURTHER SUPPORT OF RESPONDENT 1600 NELSON'SORDER TO SHOW CAUSE** |

-----------------------------------------------------------------X

**SERGE JOSEPH**, an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under the penalty of perjury:

1. I am a partner in the law firm of Himmelstein, McConnell, Gribben, Donoghue & Joseph LLP, attorneys for Respondent 1600 Nelson Avenue Housing Development Fund Corporation ["1600 Nelson"]. As such, I am familiar with the facts and circumstances as set forth hereinafter. 1600 Nelson is a Cooperative Apartment building. Twenty-six (26) families live in the building as tenant-shareholders. Many of them have been tenant-shareholders since the building became a cooperative, more than thirty-two (32) years ago.

2. I submit the within affirmation in reply to the opposition of the City of New York [the "City"], dated October 19, 2018, as well as that of Neighborhood Restore Housing Development Fund Corporation ["Neighborhood Restore"], dated October 22, 2018.

## PRELIMINARY STATEMENT

3. In essence, this case presents three principal questions.

4. First, does the subject property meet the statutory definition of a "distressed property" and therefore properly subject to In Rem Foreclosure"?

5. Second, did the City engage in, at best, misleading conduct or, at worst, malfeasance when its Department of Environmental Protection ("DEP") entered into two agreements with 1600 Nelson to pay the arrears in water and sewer charges - the first, two months before the instant proceeding was commenced, and the second, six months before it conveyed title to the subject property to Neighborhood Restore - and failed at these two critical points of time to inform 1600 Nelson that it would not honor these agreements, when such information or knowledge would have made a pivotal difference to 1600 Nelson's efforts to save its property from foreclosure?

6. Third, did the City follow all the requisite and mandatory statutory procedures in the preparation, filing and notice in this action?

7. In our initial moving papers, we established that on May 8, 2015, two months before the City commenced the underlying In Rem Foreclosure Action, with the alleged filing of the List of Delinquent Taxes in the Office of the Clerk of the County of the Bronx on July 7, 2015, 1600 Nelson entered into an agreement with the City for the payment of arrears in water and sewer charges, and consistently paid the City in accordance with the Agreement until January 2018, when 1600 Nelson faced emergency repairs to its heating system and temporarily suspended payments to the City. (See ¶ 15 of Affidavit of Guillermo E. Gomez, Respondent's Managing Agent, submitted in support of 1600 Nelson's Order to Show Cause ["Gomez Affidavit"], and Payment Agreement, annexed to the Gomez Affidavit as Exhibit D; as well as proof of payment, annexed as Exhibit F).

8. Although the City submits an Affidavit from Patrick Hendricks, who is

described as the "Director of the Collections Unit, of the Bureau of Customer Services, a division of the New York City Department of Environmental Protection", the City does not, and cannot, contest the existence of this agreement; nor that 1600 Nelson made the requisite payments; nor that the City accepted same. The City also does not deny that it failed to notify 1600 Nelson that this agreement was not valid anymore, and would not save 1600 Nelson from the loss of its property.

9. As will be demonstrated in further details below, in light of this agreement 1600 Nelson's property should not even have been included in the List of Delinquent Taxes ["the List"] subject to the instant proceeding since at the very least the List did not properly credit 1600 Nelson for payments it made. Moreover, the failure of the City to notify 1600 Nelson that the City had altered its position and rebuked the agreement constitutes a denial of due process.

10. Our moving papers also demonstrated that in March 2018, four months after the City secured a default judgment of foreclosure against 1600 Nelson, but six months before it conveyed the subject property to Neighborhood Restore[1], 1600 Nelson's Managing Agent personally went to DEP, and made another arrangement to resume the payment of the water and sewer charges. (See ¶¶ 20-21 of Gomez Affidavit).

11. Indeed, 1600 Nelson paid, and the City accepted such payments, through and including September, 2018, after the City conveyed the subject property to Neighborhood Restore. (See ¶ 22 of Gomez Affidavit).

[1] Deed dated September 5, 2018

12. The City should be estopped from repudiating these two agreements it made with Respondent to prevent manifest injustice. By entering into these agreements and accepting payments from 1600 Nelson pursuant to these agreements, the City lulled 1600 Nelson into a sense that the water and sewer issue had been resolved and there was no further threat to its ownership of the property.

13. At best, the City misled 1600 Nelson; at worst, it deceived and defrauded 1600 Nelson. Had the City informed 1600 Nelson that it would initiate a foreclosure proceeding despite the May 9, 2015 agreement, or had the City informed 1600 Nelson in March 2018, when the Managing Agent met with the DEP representative, that it had secured a default judgment and intended to soon transfer title to the subject premises to Neighborhood Restore, 1600 Nelson would have taken the necessary steps to seek appropriate relief, including seeking to vacate the default judgment, stay the transfer, to seek relief under Admin. Code § 11-412.1(d), and/or pay all the tax liens due.

14. Lastly, the City alleges that it "complied with all requirements in the Admin. Code for the preparation, filing, and notice of the in rem action." (See p. 7 of the City's Memorandum of Law).

15. As demonstrated in further details below, the City's contention is demonstrably false. In each and every step of the entire process, from the beginning to the present, the City crossed the line, trampled upon 1600 Nelson's rights, and disregarded the mandatory statutory requirements intended to provide Respondent with a modicum of protections.

16. Such pattern of conduct by the City is particularly egregious since the parties most adversely impacted and severely hurt are persons of low income whom the City should encourage to aspire to and maintain home ownership.

17. For all the reasons stated hereinafter, the arguments raised by the City, which Neighborhood Restore has merely repeated and adopted, are all without merit. Respondent 1600 Nelson's Order to Show Cause must be granted in its entirety.

## ARGUMENT

### A. The Subject Property Does Not Meet the Definition of a "Distressed Property" And Therefore Should Not Have been Subject to In Rem Foreclosure Action

18. The subject property does not even meet the statutory definition of a "distressed property" and therefore should not have been included in the instant In Rem Foreclosure Action.

19. The subject property's ensnarement by the City in this In Rem Foreclosure maze is neither unique nor an isolated event. Numerous local publications have reported on the the widespread phenomenon where the City improperly classifies properties throughout the City as "distressed", so as to clandestinely subject these properties to in rem foreclosure, unbeknownst to the owners.

20. For instance, this past Monday, November 26, 2018, the Daily News reported that: "A city program to move multi-family buildings drowning in debt and disrepair to a selected developer should be investigated for possible fraud, the Brooklyn Borough President said." See Blau, Reuven, "Brooklyn Beep Eric Adams Urges Probe Into Suspected Fraud at the City's Program to Take Over Distressed Properties", New York Daily News, November 26,

2018.[2]

21. The Daily News further reported that the Brooklyn Borough President Eric Adams and City Councilman Robert Cornegy, Chair of the City Council's Committee of Housing and Buildings have written to the NY State Attorney's General Office as follows: "Through extensive discussions with community stakeholders we have become aware that there appears to be deeper, and possibly illegal, actions undertaken to defraud homeowners of their property." *Id.*

22. Admin. Code § 11-401.1 (c) provides that only a parcel determined to be a "distressed property shall be subject to an in rem foreclosure action".

23. Indeed, the City argues in opposition that "this action is pursuant to the portion of the in rem law added by the 1996 amendment of the statute, known as modified in rem, or the Third Party Transfer Program", intended to "ensure transfer of properties in "poor condition.[3]"

24. At the time the underlying action was commenced, NYC Admin. Code § 11-401 (4) defined "distressed property" as follows:

> 4. "Distressed property." Any parcel of class one or class two real property that is subject to a tax lien or liens with a lien or liens to value ratio, as determined by the commissioner of finance, equal

---

[2] See https://www.nydailynews.com/new-york/ny-metro-housing-tpt-20181125-story.html. See aslo https://brooklyneagle.com/articles/2018/11/26/brooklyn-officials-demand-full-scale-investigation-of-home-theft-in-black-brown-neighborhoods.

[3] See ¶ 4 of Affirmation in Opposition of Assistant Corporation Counsel, Margaret Devoe.

> to or greater than fifteen percent and that meets one of the following two criteria:
>
> i. such parcel has an average of five or more hazardous or immediately hazardous violations of record of the housing maintenance code per dwelling unit; or
>
> ii. such parcel is subject to a lien or liens for any expenses incurred by the department of housing preservation and development for the repair or the elimination of any dangerous or unlawful conditions therein, pursuant to section 27-2144 of this code, in an amount equal to or greater than one thousand dollars.

25. The subject building contains 26 units, and has a total of 46 violations of record, but only 33 hazardous (26 "B" Class) and immediately hazardous violations (7 "C" Class"). (See HPD Building Registration Summary Report, annexed hereto as Exhibit A). In other words, the subject building contains an average 1.2 "hazardous" violations per dwelling unit, far below the Administrative Code threshold of a "distressed property".

26. The List filed in the instant action does not include any lien or liens for any expenses incurred by HPD. (A copy of the relevant pages of the List of Delinquent Taxes regarding the subject property is annexed to the City's opposition papers, as Exhibit 2; it is reproduced herein and annexed hereto as Exhibit B)[4]

---

[4] HPD's "Building Charges Report as of 11/10/2018 Work Orders" alleges that a "grand total of $1,259.20. See Exhibit C. However, only $812.56 can be argued consists of "expenses incurred by the department of housing preservation and development for the repair or the elimination of any dangerous or unlawful conditions therein, pursuant to section 27-2144 of the Code". The remaining $683.36 of the charges consists of "inspection fees and administrative fees", and not actual expenses incurred by HPD for the actual repair and elimination of dangerous and unlawful conditions. See Exhibit C. Moreover, it does not appear that the fees

27. Accordingly, the subject building was not a "distressed property" and should not have been subject to the modified in rem foreclosure action and/or Third Party Transfer program.

28. A finding that the property meets the definition of a "distressed property" is a mandatory statutory prerequisite for subjecting the property to the "modified in rem foreclosure" law. See NYC Admin. Code § 11-401.1(c).

29. Based upon the foregoing, Respondent's instant Order to Show Cause should be granted in its entirety.

B. The City Failed to Follow the Mandatory Notice Requirements Set Forth in the Admin. Code § 11-406

30. Contrary to the City's opposition, the City failed to comply with the mandatory filing, posting, and publication requirements of NYC Admin. Code § 11-401 et seq. in a myriad of ways.

31. First, the City failed to publish the Notice of Foreclosure "forthwith" as mandated by the Admin. Code; and to publish said notice in a newspaper which is "published in and circulated" in the Bronx.

32. NYC Admin. Code § 11-406 (a) provides as follows:

---

are properly levied. According to HPD's own policy statement, "HPD is authorized to impose a fee only "for the third and each subsequent complaint-based housing inspection it performs in a particular dwelling unit where certain conditions are met, including HPD having already inspected the unit twice in the same twelve-month period, HPD having issued hazardous (class B) or immediately hazardous (class C) violations, and the owner having failed to repair and timely certify that those violations have been corrected." In the instant matter, for example, one of the apartments for which "inspection and administrative fees" are imposed is Apartment 2E. There is no violation listed whatsoever for Apartment 2E. See Exhibit B.

> Upon the filing of a list of delinquent taxes in the office of the county clerk, the commissioner of finance forthwith shall cause a notice of foreclosure to be published at least once a week for six successive weeks in the City Record and, subject to section ninety-one of the judiciary law, in two newspapers, one of which may be a law journal, to be designated by the commissioner of finance, which are published in and are circulated throughout the county in which the affected property is located. If there are no newspapers published in such county, the commissioner of finance may designate newspapers published in the city of New York which are circulated throughout the affected county. [Emphasis supplied].

33. According to the City's Affirmation of Regularity, dated October 18, 2017, and referenced in the City's opposition[5], the verified Lists of Delinquent Taxes were filed in the Office of Clerk of Bronx County on July 7, 2015[6]. Yet, the City did not cause the Notice of Foreclosure to be published until beginning July 21, 2015[7].

34. "The words 'forthwith' and 'immediately' have the same meaning. They are stronger than the expression 'within a reasonable time' and imply prompt, vigorous action, without any delay, and whether there has been such action is a question of fact having regard to the circumstances of the particular case." *People v. Frudenberg*, 209 NY 218, 103 NE 166 (1913); *see also*, *Ayers v. Coughlin*, 72 NY2d 346, 530 NE2d 373, 533 NYS2d 849 (1988)

---

5 See¶ 11 of Affirmation in Opposition of Assistant Corporation Counsel Margaret Devoe.

6 See ¶ 2 of Affirmation of Regularity.

7 Id at ¶ 5.

["...'forthwith' means that it is to be done without delay, at once, promptly. 'Forthwith' signals immediacy."]

35. In the instant case, it is apparent that the City's purpose in enacting the Local Law 37 of 1996 was to effectuate swift and decisive action to foreclose upon affected properties.

36. In her testimony before the New York City Council Committee on Housing and Buildings in support of Intro No. 679, the bill which would become Local Law 37, and amend the relevant provisions of NYC Admin. Code 11-401 et seq, then-NYC HPD Commissioner Deborah C. Wright noted in pertinent part that "Intro No. 679 is designed to provide flexibility, speed and cost-effectiveness as the City intervenes to prevent abandonment." See Exhibit D. See also, testimony of former NYC Human Resources Administration Commissioner Liliam Barrios-Paoli ["Strict timeframes ... require swift and decisive action and resolution"] annexed hereto as Exhibit E. Parenthetically, the testimony of both shows that the purpose of the in Rem Foreclosure regulation was to include only "distressed properties".

37. The swift and fast action former Commissioners Wright and Barrios-Paoli alluded to in their testimonies was divesting property owners of their interest in properties alleged to be in arrears in tax obligations and in a state of extreme disrepair with multiple hazardous housing code violations, and thus qualifying for the "distressed property" designation.

38. The purpose of the publication requirement is to give notice to property owners affected by the City's swift and speedy action. That section was intended for the benefit of affected property owners, and other interested parties, to warn them of the impeding

foreclosure action as quickly as possible so that they will take necessary steps to protect their property. It is clear in requiring that the Notice of Foreclosure be published "forthwith" after the List is filed, however, that the City Council intended no such delay.

39. The City cannot have it both ways: It cannot, on the one hand, want to summarily foreclose properties, "fast and swiftly"; but then, on the other hand, wait 14 days to notify owners and other interested parties that they will risk forfeiting their valuable assets, and, in this case, losing home ownership. In light of the foregoing, the 14-day delay is not "forthwith" and constitutes an unreasonable delay, and the City's failure to cause the Notice of Foreclosure to be published sooner is a fatal jurisdictional defect.

40. The City not only failed to cause the Notice of Foreclosure to be published "forthwith" as mandated by the law, but it also failed to cause it to be published in the proper publications.

41. NYC Admin. Code § 11-406 (a) requires the Notice of Foreclosure to be published in two "newspapers, one of which may be a law journal, to be designated by the commissioner of finance, which are published in and are circulated throughout the county in which the affected property is located."

42. Only if there are no newspapers published in such county, can the commissioner of finance "designate newspapers published in the city of New York which are circulated throughout the affected county."

43. The Bronx County Clerk of the Supreme Court publishes a list of newspapers designated by the Appellate Division, First Department, to publish legal notices. It

includes a number of weekly newspapers published in and circulated in the Bronx, including the Bronx Free Press, the Bronx News, the Bronx Press Review, and Bronx Times Report. See copy of list, updated September 24, 2018, annexed hereto as Exhibit F.

44. In the instant case, by the City's own admission, it failed to follow these publication requirements. According to the City, the Notice of Foreclosure was instead caused to be published in the City Record, the New York Law Journal, and the New York Post[8], the latter two newspapers are not published in the Bronx, and the New York Post is not even included in the list authorized by the Bronx County Clerk of the Supreme Court, and is most certainly not published in the Bronx. (See Exhibit F).

45. Moreover, the Notice of Foreclosure itself is fatally defective and contrary to the clear mandates of NYC Admin. Code § 11-401 et seq. in that it failed to accurately describe where the List would be posted for inspection; and the duration of time the List would remain posted.

46. NYC Admin. Code § 11-406(b) provides in pertinent part as follows:

> b. Such notice shall clearly indicate that it is a notice of foreclosure of tax liens; the borough or the section of a tax map or portion of a section of a tax map in which the properties subject to foreclosure are located and where the area affected by the action includes less than all parcels in an entire borough or section of a tax map or portion of a section of a tax map, the particular class or classes contained therein, and by a general description which need not contain measurements and direction; where and when the list of delinquent

---

8 See ¶ 5 of Affirmation of Regularity.

> taxes was filed; the general nature of the information contained in the list; that the filing of the list constitutes commencement of a foreclosure action by the city in the supreme court for the particular county and a notice of pendency of action against each parcel listed; that such action is against the property only and no personal judgment will be entered; that the list will be available for inspection at the city collector's central office and at the borough office of the city collector in the borough in which said property is located until a specified date at least ten weeks after the date of first publication; that until such date a parcel may be redeemed by paying all taxes and charges contained in said list of delinquent taxes together with interest and penalties thereon; that during said period of redemption and for an additional period of twenty days after said last date for redemption any person having any interest in or lien upon a parcel on the list may file with the appropriate county clerk and serve upon the corporation counsel a verified answer setting forth in detail the full name of said answering party, the nature and amount of his or her interest or lien and any legal defense against foreclosure; and that in the absence of redemption or answer a judgment of foreclosure may be taken by default. [Emphasis supplied].

47. Thus, NYC Admin. Code § 11-406(b) mandates the published Notice of Foreclosure to provide that the List must be posted for inspection in two locations: "at the city collector's central office and at the borough office of the city collector in the borough in which said property is located."

48. In the instant action, the published Notice of Foreclosure is inadequate, defective, and contrary to the NYC Admin. Code § 11-406(b) in at least three significant ways.

49. First, whereas NYC Admin. Code § 11-406(b) requires that the List of

Delinquent Taxes be posted for inspection in two locations; the Notice of Foreclosure, in contrast, provides that the List will be posted in only one.

50. Thus, according to the City's opposition, the Notice of Foreclosure, published in the City Record, in the New York Law Journal and in the New York Post[9], provides instead that "a certified copy of such list of delinquent taxes has been filed in the Bronx Business Center of the City of New York Department of Finance, 3030 Third Avenue, Second Floor, Bronx, NY 10455..." (See Exhibit H).

51. Second, whereas NYC Admin. Code § 11-406(b) mandates the Notice at Foreclosure to provide that the List will be posted at "the city collector's central office and at the borough office of the city collector in the borough in which said property is located, the published Notice of Foreclosure, however, does not say that the posting will be at "city collector's central office or at the borough office of the city collector", but rather "in the Bronx Business Center".

52. This discrepancy in the description of the sites or locations where the List will be posted is significant because it creates confusion, and ambiguity, and is therefore jurisdictionally defective and fatal.[10] *See, Wayman v. Zmyewski*, 218 AD2d 843, 629 NYS2d 871

---

[9] On behalf of Respondent, we have issued a subpoena *duces tecum* and *ad testificandum* to the New York Post to ascertain whether the Post in fact published the Notice at least once a week for six successive weeks. See Exhibit G. We were compelled to do so because unlike the Record and the New York Law Journal, the Post would not provide or make available its past publications. Therefore, we reserve the right to supplement our arguments upon the Post's compliance with our subpoena.

[10] The "borough office of the city collector" and the "Bronx Business Center" may well describe the same office. Still, the burden should not be placed on owners and other

(3rd Dept., 1995) [foreclosure sale set aside because published notice stated sale would be on courthouse 'steps' but sale took place in the courthouse lobby]; see also, *Weil v. Laube*, 235 NYS 14, 134 Misc 454 (Sup Ct., 1929), aff;d 227 AD 729, 236 NYS 919 (2nd Dept., 1929) [sale vacated where sale was noticed to be held at main entrance of courthouse, but was held instead in rotunda].

53. Third, whereas NYC Admin. Code § 11-406 (b) requires the Notice of Foreclosure to provide that the posted List will be available for inspection "until a specified date at least ten weeks after the date of first publication" [emphasis supplied], the published Notice, however, specifies the "29th day of September, 2015", which was on or before the expiration of ten weeks after the date of first publication, which according to the City was July 21, 2015.

54. In *Olds v. Jamestown*, 280 NY 281, 20 NE2d 756 (1939), the Court of Appeals stated that "Notice by publication once a week for six successive weeks is given when six weeks have expired - not before."

55. See also, *Albany v. Goodman*, 203 AD530, 197 NYS 739 (3rd Dept., 1922) [the terms of sale of city real property must be strictly complied with all applicable provisions of the statute; and failure to do renders sale invalid and void]; *Stevens v. Breen*, 258 AD 423, 16 NYS2d 909 (2nd Dept., 1940) ["The [lower] Court properly held that defendant's tax title was bad because notice of the tax sale, while it was published once a week for six weeks, was not continued for a period of forty-two days]; and *Welhaven v. Kohn*, 257 AD 744, 15 NYS2d 183

---

interested persons and entities, who are already engaged in the Herculean task of navigating the in rem foreclosure process, to figure out the City's Kafkaesque lexicon and monikers.

(3rd Dept., 1939) [publication notice not strictly complied, and sale invalidated where notice by publication required once a week for six successive weeks, but sale took place after 38 days of first publication instead of 42 days].

56. In the instant case, the September 29, 2015 date, specified in the Notice of Foreclosure published, jumped the gun, and did not provide owners of affected properties at least ten weeks after the date of the first publication. Such date did not allow the expiration of the requisite ten-week period.

57. The City also failed to comply with the actual posting requirements of NYC Admin. Code § 11-401 et seq.

58. NYC Admin. Code § 11-406 (d) provides as follows:

> d. The commissioner of finance shall cause a copy of such notice to be posted in the office of the commissioner of finance, in the county courthouse of the county in which the property subject to such tax lien is situated and at three other conspicuous places in the borough in which the affected properties are located.

59. Thus, in the instant case the statute requires the Notice to be posted in five (5) different locations in the Bronx. In contrast, the City admits[11] that it merely posted the Notice two times in offices located at the same address: 3030 Third Avenue, 2nd Floor, Bronx, New York 10457 (The Bronx Business Center of the New York City Department of Finance and the Bronx Office of the New York City Register).

60. The City also states that it posted the public interviewer area at the

---

[11] See ¶ 7 of the Affirmation of Regularity.

Bronx borough office of the New York City Department of Housing Preservation and Development, 1932 Arthur Avenue, 3rd Floor, Bronx, New York 10457; and in the main office of the Commissioner of the Department of Finance, 1 Centre Street, 5th Floor, New York, New York 10007. Neither satisfies the posting requirement of NYC Admin. Code § 11-406 (d). The public interviewer area at the Bronx borough office of the New York City Department of Housing Preservation and Development, 1932 Arthur Avenue, 3rd Floor, Bronx, New York 10457 is not a "conspicuous" place as it houses HPD's Division of Code Enforcement where interested persons seek, inter alia, "information about housing code violations existing at your property and guidance on how to address them", issues not relevant in this matter.

61. Lastly, two of the postings were allegedly done after July 21, 2015, therefore not providing persons who may have inspected the postings the requisite "at least ten weeks" period. According to the City's own Affidavits of Posting, the posting in the New York State Supreme Court, Bronx County did not take place until July 23, 2015; and the posting on the "bulletin board directly outside the office of the Commissioner of the Department of Finance" did not take place until August 10, 2015. (See affidavits of posting annexed to the Affirmation of Regularity, which was annexed as Exhibit 1 to the City's Opposition; it is reproduced herein as Exhibit I).

C. The Requirements of NYC Admin. Code 11-406(b) are Mandates; Must be Strictly Complied with; and Failure to do so is a Jurisdictional Defect

62. The requirements of NYC Admin. Code § 11-406 (b) must be strictly complied with. Failure on the part of the City to substantially comply with its mandatory requirements is a jurisdictional defect. A deed acquired from a flawed process, such as in the instant case, is void.

63. As the Court of Appeals in a similar tax foreclosure case, *Werking v. Amity Estates, Inc.*, 2 NY2d 43, 155 NYS2d 633 (1956) has instructed:

> The word "shall" is one of mandate. Without question, the statute was enacted for the benefit of the taxpayer. The Legislature has commanded that the collector provide the requisite notice and in its wisdom, has described the specific procedure with that which the Legislature has deemed necessary. If we were permitted to dispense with one requirement of [the law], we would be able to excuse compliance with the statute in toto.

64. The Court went on further to note that the failure of the "tax collector to substantially comply with the mandatory requirements of [the law] pertaining to notice is a jurisdictional defect." See also, *Olds v. Jamestown*, *supra* where the Court held in pertinent part that "Failure to give the notice required by law is jurisdictional defect, which cannot be overlooked or remedied by curative statute. Statutes which limit the time for redemption after tax sales are not applicable where the tax sale is void and no title is passed."

D. 1600 Nelson was Not Properly Served with the Notice of Foreclosure; and in the Face of Sworn Affidavits from 1600 Nelson's Managing Agent, Officers, and Shareholders, the City has Failed to Produce Competent Evidence to the Contrary

65. 1600 Nelson's Managing Agent, officers, and shareholders unequivocally deny having received a Notice of Foreclosure, or any document notifying the affected persons that the City had commenced a foreclosure proceeding against the subject premises. See ¶ 6 of Gomez Affidavit; see also, ¶ 7 of Affidavit of Gloria Flores, 1600 Nelson's Secretary; and see further, Affidavit of Juana Cotto, a shareholder.

66. Ms. Cotto resides in Apartment 5A. The significance of this is that the City alleges that it mailed one of the notices addressed to 1600 Nelson Avenue HSING DEV to that address on July 14, 2015, and that this package was delivered on July 16, 2015. (See ¶ 3 of Cotto Affidavit).

67. Ms. Cotto says in her affidavit that the City's allegations are "pure fiction."

68. Ms. Cotto has also noted that the City's allegations are highly suspect because the mailing of the Notice took place three days before the Notice was even written: The Notice was written on July 17, 2015; yet it was supposedly mailed on July 14.

69. Incredibly, the City's opposition is silent on this.

70. It is true that when there is proof of mailing, mere denial of receipt is insufficient to rebut the presumption that proper notice was given. *Centennial Elevator Industries, Inc. v. Ninety-Five Madison Corp.*, 90 AD3d 689, 934 NYS2d 483 (2nd Dept, 2011); *Wieck v. Halpren*, 255 AD2d 438, 680 NYS2d 599 (2nd Dept., 1998).

71. This presumption is inapplicable where, as in the instant case, the affidavit and documents themselves are highly suspicious and questionable.

72. Moreover, the presumption is not available in the absence of an affidavit providing evidence of mailing to the person or entity to which the notice is to be given. There must be an affidavit by a person with personal knowledge of the mailing in order for an affidavit to be sufficient for the Court to make a factual determination that the mailing was made. *AB Medical Services PPLC v. Specialty National Ins. Co.*, 11 Misc3d 144(A), 810 NYS2d 846 (AT, 2nd and 11th Jud. Dist, 2006).

73. Although proof of mailing may consist of an affidavit describing routine procedure, that proof must show that the item mailed was properly addressed. If the routine office practice is careless, it is insufficient to prove that an item was duly mailed as required.

74. In order for the presumption of proper mailing to arise, office practice must be geared so as to ensure the likelihood that a notice is always properly addressed and mailed.

75. In *Nassau Inc. Co. v. Murray*, 46 NY2d 828, 414 NYS2d 117 (1978), the Court of Appeals ruled that the presumption applies only when there is proof that the item was properly addressed and mailed, noting in pertinent part that "in order for the presumption to arise, office must be geared so as to ensure the likelihood that a notice of cancellation is always properly addressed and mailed."

76. The documents submitted in support of the judgment contained in the Court file fail to demonstrate that the Notice of Foreclosure was mailed to 1600 Nelson or that

the presumption arises. The Affirmation of Regularity and the affidavits of mailing describe the general office procedure for mailing Notices of Foreclosure. However, they fail to show that this general office procedure was followed, and if followed would ensure the likelihood that the notices are properly addressed and mailed.

77. As previously noted, the City's Exhibit 1 consists of the Affirmation of Regularity of Andrea B. Feller, where she recites that Notices of Foreclosure were mailed to the owner of each property for which the Department of Finance had a mailing address, and in support of this contention refers to the affidavits of Pamela Parker-Cortijo, an employee of the Department of Finance, and Donald O'Connell, Executive Vice President of Vanguard Direct, Inc.

78. In paragraph 2 of Pamela Parker-Cortijo's affidavit, she states the reason for submitting her affidavit:

> I submit this affidavit to explain Finance's procedures for the preparation and mailing of notices of in rem tax foreclosure and, specifically, to describe the procedures undertaken with respect to this action.

(Pamela Parker-Cortijo's affidavit is reproduced herein, and annexed hereto as Exhibit J).

79. She goes on to note procedures she "believed" were undertaken "by others" including, Shophia Walkes, Senior Director of Finance's Tax Lien Unit; Chandravali Mohan, Project Manager of Finances's Case Tracking Unit; Bill Nopper, Computer Systems Manager of Finance's Noticing Group; Annette Malatesta, Finance's Production Unit; and Donald O'Connell of Vanguard.

80. Similarly, the Affidavit of Donald O'Connell, of Vanguard states the same reason for submitting his affidavit: to describe the general procedures. (The Affidavit of Donald O'Connell is reproduced herein and annexed hereto as Exhibit K).

81. None of these affidavits and the documents annexed to them show that anyone with personal knowledge checked the names and addresses on the envelopes to make sure that the notices of foreclosure were actually sent to the owners of the properties involved.

82. The affidavit of regularity and the affidavits of mailing and bulk mailing receipts fail to show the names and addresses of the persons and entities to which the Notice of Foreclosure was sent. The conclusory statements contained in the aforementioned affidavits do not, and cannot, show to whom and to what addresses the mailings were made. The affidavits refer to computers having generated the names and addresses for mailing. However, they do not show that any live person actually checked the names and addresses of the recipients of the mail against the records contained in the Department of Finance, which records are supposed to contain the names and addresses of the owners or other persons or entities to which tax bills and notices are to be sent.

83. The necessity for a person to check the names and addresses on the envelopes actually mailed was pointed out by the Court in *Lubermens Mut. Cas. Co. v. Comparato*, 151 AD2d 265, 267, 542 NYS2d 179, 181 (1st Dept., 1989), where the Court ruled as follows:

> Although an officer may testify as to office practice and policy, when reliance is placed on a mailing sheet, proof must include testimony that the employee checks the names and addresses on the

envelopes with those on the mailing sheets in the
regular course of business.

84. See also, *Matter of Government Employees Inc. Co*, 112 AD2d 226, 227, 491 NYS2d 442, 443-444 (2nd Dept, 1985); *Colon v. National Mut. Fire Ins. Co.*, 211 AD2d 579, 621 NYS2d 608 (1st Dept., 1995); *Friedman v. Allcity Inc. Co.*, 118 AD2d 517, 500 NYS2d 124 (1st Dept., 1986).

85. The certificates of bulk mailing from the United States Postal Service merely state that certain numbers of items were mailed but do not disclose to whom those items were addressed.

86. The affidavits state that the mailings were made by mailing services, but there are no affidavits from persons working for the mailing services showing to whom and to what addresses the mailings were actually made.

87. The City's Affidavits submitted in opposition do not address these defects.

88. Accordingly, Respondent's motion should be granted in its entirety.

E. The City's Failure to Serve Respondent a Copy of the Judgment Deprived Respondent of the Opportunity to Redeem the Property; and is Constitutes a Denial of Due Process

89. There is no dispute that the City failed to serve Respondent with a copy of the judgement of foreclosure.

90. Had Respondent received a copy of the judgment, it would at least have had the opportunity to redeem the property as provided in the judgment.

91. Respondent was entitled to a notice of its right to redeem the property following the judgment of foreclosure.

92. In *Orange County Commissioner of Finance v. Helseth*, 24 Misc3d 204, 210, 875 NYS2d 754, 760 Sup Ct., 2009), aff'd 73 AD3d 1053 (2nd Dept, 2010), the Court held:

> Notice of a right to redeem one's property from the municipality into which title vests following a tax lien foreclosure sale enjoys constitutional procedural due process protection [citations omitted].

93. Admin. Code § 11-412.1 (d) provides in pertinent part as follows:

> d. Within four months after the date on which, pursuant to subdivision b of this section, the final judgment authorizing the award of possession of a parcel of class one or class two real property was entered, any person claiming to have an interest in such parcel shall have the right to make a payment to the commissioner of finance consisting of all taxes, assessments and other legal charges owing on said parcel, the lawful interest thereon to the date of payment and a penalty of five percent of said payment of taxes, assessments and other legal charges and interest, which penalty may not exceed one thousand dollars. Such payment shall be made in cash or by certified or bank check. Within such four-month period, such interested person may also request an installment agreement from the commissioner of finance. Such agreement shall require, in addition to full payment of the penalty specified in this subdivision at the time such agreement is entered into, the payment at such time of a first installment equal to fifty percent of all taxes, assessments and other legal charges, and the lawful interest thereon, then owing on such parcel, and the payment of the balance of such taxes, assessments and other legal charges and interest in four equal quarterly installments together with all current taxes, assessments and other legal charges that accrue during such period. Upon receipt of payment in full of the amount specified in the first sentence of this subdivision, the commissioner of

> finance shall direct the corporation counsel to prepare and cause to be entered an order discontinuing the in rem tax foreclosure action as to said property, cancelling the notice of pendency of such action as to said property and vacating and setting aside the final judgment. Upon the execution of an installment agreement and payment of the amounts due at the time such agreement is executed as provided in this subdivision, the commissioner of finance shall direct the corporation counsel to prepare and cause to be entered an order vacating and setting aside the final judgment. The entry of either such order shall restore all parties, including owners, mortgagees and any and all lienors, receivers and administrators and encumbrancers, to the status they held immediately before such final judgment was entered. Where the commissioner of finance approves an application requesting an installment agreement pursuant to this subdivision, the order vacating and setting aside the final judgment shall provide that in the event of any default as to the payment of either quarterly installments or current taxes, assessments or other legal charges during the term of such agreement, all payments under said agreement shall be forfeited and the corporation counsel, immediately upon notification by the commissioner of finance of such default, shall cause to be entered as to such property a supplemental judgment of foreclosure in the in rem action which authorizes the commissioner of finance to prepare, execute and cause to be recorded a deed conveying either to the city or to a third party full and complete title to such lands. Upon the entry of such supplemental judgment, the provisions of subdivisions c through i of this section shall apply in the same manner as such subdivisions would have applied had no payment been made nor installment agreement executed during the four-month period specified in this subdivision.

94. Had the City served Respondent with a copy of the judgment together

with a notice of entry, Respondent would have been aware of the expiration date of its right to redeem the property by either payment to the Commissioner of Finance of the judgment, or request an installment agreement.

95. Without this knowledge, the right to redeem is illusory.

96. The failure of the City to make sure that the notice of foreclosure was properly addressed to Respondent was further exacerbated by the failure to notify Respondent that the agreements it entered into with the City were being rebuked by the City; and by the failure of the City to serve Respondent with a copy of the judgment.

97. Respondent was deprived of the opportunity to redeem the property by payment or an installment agreement; and was also deprived of the opportunity to apply to the City for the release of the City's interest in the real property.

F. The City's Conduct in Entering into Agreements with Respondent, but Failing to Inform Respondents that these Agreements were Invalid Is Misleading; the City should be Estopped from Repudiating its Agreements with Respondent

98. Although the doctrine of equitable estoppel may not be invoked to prevent a governmental agency from discharging its statutory duties, it may be nevertheless be invoked to prevent manifest injustice. In *Bender v. NYC Health and Hospitals Corp.*, 38 NY2d 662, 668, 345 NE2d 561, 564, 382 NYS2d 18, 21 (1976), the Court held in pertinent part as follows:

> We believe that where a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice, that subdivision should be estopped from asserting a right or defense which it otherwise could have waived.

99. In the instant case, Respondent was misled by DEP which acted as if it were authorized to enter into the agreements with Respondent. As a result of having been misled, Respondent did not satisfy the arrears prior to the execution of the deed by the DOF, or seek an installment agreement pursuant to Admin. Code § 11-412.1 (d).

100. Respondent was further victimized by the City's bureaucratic confusion created solely by DEP, a division of the City of New York. This failure was compounded by the failure of the City and its agencies to notify Respondent that the agreements had been rebuked by the City.

101. In *Landmark Colony at Oyster Bay v. Board of Sup'rs*, 113 AD2d 741, 493 NYS2d 340 (2nd Dept., 1985), the Court concluded that the plaintiff was a victim of bureaucratic confusion and deficiencies and applied the principle of equitable estoppel against a governmental agency.

102. The *Landmark Colony*, supra, Court found in pertinent part as follows:

> Thus, the doctrine of equitable estoppel should apply to preclude imposition of the penalty in this case. It is settled that a municipality or other governmental subdivision may be estoppel where its wrongful or negligent conduct induces a party relying thereon to change his position to his detriment (*Bender v New York City Health & Hosps. Corp.*, 38 NY2d 662, 668; see also, *La Porto v Village of Philmont*, 39 NY2d 7, 12). Although estoppel should not be invoked against governmental entities in the absence of exceptional circumstances (*Luka v New York City Tr. Auth.*, 100 AD2d 323, 325, affd 63 NY2d 667), we have not hesitated to do so where a municipality's misleading nonfeasance would otherwise result in a manifest injustice ( *Matter of 1555 Boston Rd. Corp. v*

> *Finance Administrator of City of N.Y.*, 61 AD2d 187, 192).

103. Recently, the Court in *Matter of Emporium Mgt Corp v. City of New York*, 1212 AD3d 981, 995 NYS2d 127 (2nd Dept., 2014), the Court reaffirmed that the principle of equitable estoppel may be invoked against governmental agencies. It pertinent part it held:

> [A]lthough estoppel should not be invoked against governmental entities in the absence of exceptional circumstances, we have not hesitated to do so where a municipality's misleading nonfeasance would otherwise result in a manifest injustice" (Landmark Colony at Oyster Bay v Board of Supervisors of County of Nassau, 113 AD2d 741, 744, 493 NYS2d 340 [1985] [citation omitted]). "To establish estoppel, the misconduct of the public agency must have induced justifiable reliance by a party who then changed his position to his detriment" (Matter of [**130] County of Orange [Al Turi Landfill, Inc.], 75 AD3d 224, 238, 903 NYS2d 60 [2010]; see Bender v New York City Health & Hosp. Corp., 38 NY2d 662, 668, 345 NE2d 561, 382 NYS2d 18 [1976]; Landmark Colony at Oyster Bay v Board of Supervisors of County of Nassau, 113 AD2d at 744).

104. The facts of *Matter of Emporium Mgt Corp v. City of New York*, supra, are strikingly similar to the instant case. In *Matter of Emporium*, the owner, Emporium, entered into an installment agreement with the City in July 2011. Notwithstanding this, the City conveyed the owner's property to Neighborhood Restore on September 23, 2011. The City cancelled the agreement on August 16, 2011, but never informed the owner.

105. The Court found that the City's "failure to contact Emporium once it

determined that the installment agreements would not be honored constitutes misleading conduct."

106. The Court in *Matter of Emporium Mgt. Corp* went on to explain:

> Moreover, the city respondents maintained their silence during a period of time when action could have made a difference to Emporium (cf. Dorce v United Rentals N. Am., Inc., 78 AD3d 1110, 1111, 915 NYS2d 79 [2010]). Had the city respondents notified Emporium on August 16, 2011, of the cancellation of the installment agreements, Emporium would have had the opportunity—up until September 23, 2011, the date on which the Commissioner of Finance deeded the properties to Neighborhood Restore—to seek discretionary relief from the City, notwithstanding the fact that more than four months had passed from the date of entry of the judgment of foreclosure (see Administrative Code of City of NY § 11-424 [g]). Had such relief been granted, Emporium could have redeemed its properties upon payment in full of the tax arrears and other fees (see id.).

*Matter of Emporium Mgt. Corp. v City of New York*, 121 A.D.3d 981, 984, 995 N.Y.S.2d 127, 130, (2nd Dept, 2014).

107. In the instant matter, in reliance upon the agreements with DEP, 1600 Nelson did not redeem its property by paying the arrears in full or seeking relief under the Admin. Code § 11-412.1 (d). By disregarding its own agreement and failing to notify 1600 Nelson that the agreements were no longer valid, and then conveying the property to Neighborhood Restore, the City deprived Respondent of its property and its shareholders of their home ownership. This is manifestly unfair and unconscionable, warranting the application of the doctrine of equitable estoppel.

G. The Conveyance of Title to The Property to Neighborhood Restore is Contrary to the Court's Judgment and therefore Invalid; it Should be Set Aside

108. On the same day the City conveyed title to Neighborhood Restore, it entered into a Third Party Transfer Program, demonstrating that the transfer of title was not in fee simple absolute, and was not authorized by either the Administrative Code or the judgment of foreclosure in the instant case. The transfer of title is therefore a nullity.

109. Under Admin. Code § 11-412.1, the City may convey title to affected properties.

110. Admin. Code § 11-412.1 (c) specifies the type of full and complete title which the Commissioner of Finance shall convey to the third party providing that upon the execution of the deed, the "city or the third party shall be seized of an estate in fee simple absolute in such land..."

111. The judgment, in accordance with the provisions of Admin. Code § 11-412.1 (c), provides as follows:

> ".. that upon the execution of said deed or deeds to the City or to a third party ..., the grantee shall ... be seized of an estate in fee simple absolute ... [emphasis supplied].

A copy of the judgment is annexed hereto as Exhibit L.

112. The estate conveyed to Neighborhood Restore, however, was less than fee simple.

113. The relevant portions of the Third Party Transfer Agreement,

demonstrating that the estate conveyed to Neighborhood restore was not fee simple absolute are set forth as follows:

> 1. Owner shall not, without the prior written consent of HPD, cause or permit any total or partial transfer, sale, disposition, transfer, assignment or conveyance of any interest in the Premises, or any part thereof, at any time prior to the third anniversary of the Closing Date, except as permitted under Paragraph 2 and Paragraph 3 below.
>
> 2. HPD shall have the right to direct Owner to deliver a deed conveying full and complete title to the Premises or a portion thereof to a person or entity designated by the City at any time prior to the third anniversary of the Closing Date. HPD shall exercise such right by notice to Owner indicating (i) the name and address of the such person or entity designated by the City, (ii) the date by which such transfer of title shall occur, which date shall not be less than thirty (30) days after the date of delivery of such notice, and (iii) and such other information as HPD shall determine.
>
> 3. Owner shall have the right to deliver a deed conveying full and complete title to the Premises or a portion thereof, free of all liens and encumbrances other than municipal liens and encumbrances, to the City or its designee (the "Right of Conveyance") for a period (the Conveyance Period") terminating on the second anniversary of the Closing Date and commencing on the earlier of (i) the first anniversary of the Closing Date, or (ii) the date that HPD stops providing funding to Owner at the levels set forth in the budget previously agreed to by HPD and Owner for the property to be conveyed.
>
>     a. Owner shall notify the City in writing, not less than seventy-five (75) days in advance, of Owner's intention to exercise the Right of Conveyance (the "Conveyance Notice").

b. Within sixty (60) days following receipt of the Conveyance Notice, HPD shall direct Owner in writing to deliver a deed of the Premises (or a portion thereof) to either (i) the City, or (ii) a person or entity designated by the City and identified in such written direction (the "Designation Notice"). If the City fails to deliver the Designation Notice within the required sixty (60) days, the Designation Notice will be deemed to have been delivered and to have identified the City as the recipient of the deed. The Designation Notice may include such other information as the City shall determine, including, but not limited to, the date upon which Owner shall deliver such deed, which date shall be not later than the earlier of the final day of the Conveyance Period or seventy-five (75) days after receipt by Owner of the Designation Notice.

c. Following receipt of the Designation Notice and prior to the expiration of the Conveyance Period but no later than the date set forth in the Designation Notice, Owner shall deliver a deed conveying full and complete title to the Premises or a portion thereof to the person or entity identified in the Designation Notice.

d. The Right of Conveyance shall not run with the land and shall terminate in its entirety upon any total or partial transfer, sale, disposition, assignment or conveyance of any interest in the Premises, or any part thereof, by Owner, including, but not limited to, an exercise by Owner of the Right of Conveyance.

A copy of the Third Party Transfer Agreement is annexed hereto as Exhibit M.

114. The restrictions contained in the Third Party Transfer Agreement with

Neighborhood Restore make clear that the title granted to Neighborhood Restore was not fee simple absolute, but fee simple subject to several conditions subsequent. At the time that title was conveyed to Neighborhood Restore, the City reserved the right of reacquisition. The condition was a demand by the City. The City retained a future estate in itself as defined in EPTL § 6-4.6, which provides as follows:

> A right of reacquisition is the future estate left in the creator or in his successors in interest upon the simultaneous creation of an estate on a condition subsequent.

115. The deed to Neighborhood Restore did not vest fee simple absolute title in Neighborhood Restore upon the execution of the deeds as required by the Administrative Code and the judgment of foreclosure.

116. Only after the passage of three years would the right of reacquisition by the city lapse and the estate of Neighborhood Restore ripen into an estate in fee simple absolute.

117. The Administrative Code and the judgment of foreclosure both required that title in fee simple absolute be conveyed to the grantee within eight months of the entry of the judgment of foreclosure.

118. Accordingly, the deed to Neighborhood Restore is invalid and should be set aside.

H. The Four-Month Period Does Not Apply to Bar 1600 Nelson From its Right to Challenge <u>the Failure to the City to Afford Respondent's Due Process Notice</u>

119. Where jurisdiction has not been obtained due to defective service, a party against whom the judgment was entered may contest the jurisdiction of the Court. In *ISCA Enterprises v. City of New York,* 77 NY2d 688,698,572 NE2d 610,614,569 NYS2d 927,931 (1991), the Court stated:

> ... [A] challenge to the constitutionality of a notice provision, where the party had no timely notice, is not barred by the Statute of Limitations ... "

77 NY2d at 698,572 NE2d at 614, 569 NYS2d at 927.

120. All formal requirements governing tax sale proceedings must be scrupulously satisfied, because the result is divestiture of title to real property. *Land v County of Ulster*, 84 NY2d 613, 616, 644 NE2d 1325, 620 NYS2d 769. Thus, "the failure to substantially comply with the requirement of providing the taxpayer with proper notice constitutes a jurisdictional defect which operates to invalidate the sale or prevent the passage of title". *Matter of Byrnes v County of Saratoga*, 251 AD2d 795, 797, 674 NYS2d 463. "Tax foreclosure proceedings enjoy a presumption of regularity, such that [t]he tax debtor has the burden of affirmatively establishing a jurisdictional defect or invalidity in [such] proceedings". *Matter of County of Sullivan [Matejkowski]*, 105 AD3d 1170, 1171, 964 N.Y.S.2d 266, appeal dismissed 21 NY3d 1062, 996 NE2d 911, 974 NYS2d 30.

121. As Respondent has demonstrated, the City failed to substantially comply with the mandatory filing, posting, and publication requirements of NYC Admin. Code § 11-401 et seq.

122. Thus, jurisdiction has not been obtained. Accordingly, the four-month

statute of limitations cannot preclude Respondent from challenging the default judgment and transfer of title. See, *Olds v. Jamestown*, 280 NY 281, 20 NE2d 756 (1939) ["Failure to give the notice required by law is jurisdictional defect, which cannot be overlooked or remedied by curative statute. Statutes which limit the time for redemption after tax sales are not applicable where the tax sale is void and no title is passed"].

**CONCLUSION**

**WHEREFORE**, for all the reasons set forth herein, it is respectfully submitted that this Court should grant Respondent's Order to Show Cause in its entirety, along with such other and further relief as the Court may deem just and proper under the circumstances.

Dated: New York, New York
November 28, 2018

SERGE JOSEPH