# EXHIBIT D

**2000 Better Government Competition WINNER**

# Breaking the Cycle of Abandonment

## Using a Tax Enforcement Tool to Return Distressed Properties to Sound Private Ownership

**Christopher J. Allred**
New York City Department of Housing Preservation and Development[1]



*Reclamation of an abandoned apartment building in New York City.*



## THE PROBLEM

In the 1960s and 1970s, the City of New York ("the City") suffered a surge of disinvestment and housing abandonment in many of its neighborhoods. A number of factors contributed to the disinvestment. According to Frank P. Braconi, the Executive Director of the Citizens Housing and Planning Council,

> The fundamental cause of housing abandonment was demographic change and the steady impoverishment and depopulation of many inner-city neighborhoods. As middle- and working-class whites sought more attractive housing options...black and Puerto Rican migrants replaced them in the city's older, more densely built neighborhoods…. These minorities tended to have lower incomes and far higher rates of joblessness, making it more difficult for owners of marginal rental buildings to collect rents commensurate with building maintenance and operating expenses.[2]

The problem was exacerbated by the high fuel costs, high inflation rates, and difficult economic times of the 1970s. Higher heating bills increased owner operating expenses, while high inflation rates made refinancing impossible and increased owner debt service expenses. Owners could not recover these increased costs because their tenants could not afford higher rents. According to Mr. Braconi, "Between 1971 and 1981 heating oil prices increased by 430 percent and overall operating costs of apartment buildings in New York City rose by 131 percent…. Those years coincided with the period of peak housing abandonment."[3]

Unable to make a profit on their properties during this time, many owners deferred maintenance and services, which led to further physical and financial decline of buildings. As income decreased and costs increased, many owners were unable to pay the property taxes on their buildings, which ultimately led to City foreclosure.

Once owners recognized City foreclosure was imminent, they often intentionally accelerated property disinvestment: they failed to make repairs and stopped services, and many eventually abandoned their buildings. Unwilling to let occupied buildings go unmanaged, the City took ownership of these properties through *in rem* foreclosures.[4]

[1] Robin Weinstein, acting deputy commissioner of the New York City Department of Housing Preservation and Development's Office of Housing Intervention and Resources, provided substantial assistance with content and editing.

[2] Frank P. Braconi, "In Re *In Rem*: Innovation and Expediency in New York's Housing Policy," in Michael H. Schill (ed.), *Housing and Community Development in New York City: Facing the Future* (Albany, NY: State University of New York Press, 1999), pp. 94-95.

[3] Braconi, p. 96.

[4] *In rem* is Latin for "against the thing" and refers to foreclosure actions on real estate for tax delinquency.

***The City had initiated the policy of foreclosure with two goals in mind: to encourage tax compliance and to allow the City to intervene in these buildings before they deteriorated completely…. However, despite its sustained efforts the City was not up to the Herculean task of managing thousands of buildings.***

The City had initiated the policy of foreclosure with two goals in mind: to encourage tax compliance and to allow the City to intervene in these buildings before they deteriorated completely. At the time, the City hoped its intervention would rescue the buildings, and in some areas the City succeeded.

> Between the winter of 1979 and the winter of 1981 the percentage of occupied *in rem* buildings without heat on any given day was reduced from nine to two, and the median time required to restore heat was cut from 14 days to three. Overall, the number of tenant complaints received by the agency's Central Complaint Bureau decreased from 56,000 in 1979 to 13,400 in 1983.[5]

However, despite its sustained efforts the City was not up to the Herculean task of managing thousands of buildings. As one local newspaper editorial put it, "Back in the 1970s and '80s, the City seized so many buildings for tax arrears it became the biggest slumlord in the state....Those buildings were dumps when the city seized them, and, sadly, most remain that way—barely habitable magnets for crime, disease and misfortune."[6]

## The Sickest Block in New York City

Once called the "Sickest Block in the City of New York," by 1994, 22 of 36 buildings on West 140th Street had been abandoned to city control.[7]

The building at 212 West 140th Street had been taken into City ownership through an *in rem* tax foreclosure action on May 25, 1978. At the time of foreclosure, the owner owed $30,013.54 in delinquent property taxes. The building was originally constructed in 1926 to provide housing for 18 working families. By 1980 it was vacant.



*The entrance to 212 West 140th Street in New York City prior to rehabilitation by the City (left)—17 years after the building was acquired by foreclosure—and a year later (right) after renovations were finally completed.*

In April 1995 the City began rehabilitation of the building. The project was completed in June 1996 at a total cost of $1.33 million. During the 18 years of City ownership the City lost approximately $160,000 in tax revenue.[8] Based on program per-unit maintenance and utility cost averages, the City spent approximately $1.3 million maintaining this building.[9] In sum, between maintenance, foregone tax revenue, and rehabilitation costs, the City spent approximately $2.8 million to restore the building to the private sector working class housing it was years earlier.

By 1994, the City owned and managed 5,458 buildings—most were dilapidated multi-family housing occupied by a low-income population. Tremendous efforts were made to address the severe physical and financial problems facing most of these properties. However, the City lacked sufficient capital resources to address their needs. The resulting impact on neighborhood quality-of-life and on local real estate markets was devastating. It was clear the City could no longer be the landlord of last resort. A new, more effective strategy was needed.

[5] Braconi, p. 99.

[6] "Turning Houses into Homes," *Daily News,* 11 October 1999, p. 40.

[7] Brian Kates, "The Sick Truth About W. 140th: Disease, Neglect, Vermin And Death," *Daily News,* 27 December 1994, p. 13.

[8] City of New York Department of Finance tax records as of 15 September 2000.

[9] Michael van Biema, Assistant Commissioner, Division of Property Management, City of New York Department of Housing Preservation and Development, "FY1998 New Needs," memo to Judy Wada, Budget Director, Office ofthe Commissioner, 30 December, 1997, table 3 ($4,069 per unit total annual maintenance, repair, and fuel costs, not including rental income).

Case 1:23-cv-09616-LTS Document 17-4 Filed 03/29/24 Page 4 of 21


The City asked the Arthur Anderson consulting firm to assess the costs associated with the *in rem* stock, consisting of 51,672 units in 5,458 buildings, of which 75 percent were occupied (see figure 1). The average length of City ownership of these *in rem* properties was 19 years. While the foreclosed properties had an average tax delinquency of $36,000 at vesting, the City spent an average of $2.2 million to acquire, manage, repair, and dispose of each vested building. The estimated total cost to the City was $10.6 billion, excluding an average of $209,000 per property in foregone tax revenues.[10]

In addition, despite the City's large capital investment in these buildings, many of them continued to have significant physical maintenance deficiencies. According to the 1991 Housing and Vacancy Survey, 22.9 percent of the properties had four or more heating breakdowns, 66.4 percent had cracks or holes in walls/ceilings/floors, 35.5 percent had broken plaster, and 76.9 percent had rodents present.[11] A moratorium on *in rem* vesting was declared in 1993.

**Figure 1. New York Housing Preservation and Development (HPD) Properties**




## A NEW STRATEGY: THE THIRD PARTY TRANSFER INITIATIVE

In 1994, led by former New York City Department of Housing Preservation and Development (HPD) Commissioner Deborah Wright, the administration gathered a group of tax and housing policy experts to determine a more effective strategy. The City also enlisted pro bono assistance from Arthur Anderson.

The group recommended the City sell the liens on all tax delinquent properties. However, HPD recognized that focusing only on tax collection would be insufficient for distressed residential properties. The City had an approximately 3.4 percent housing vacancy rate, and it could not afford to lose any residential housing.[12] Furthermore, tax lien sales alone would do nothing to improve the living conditions for the tenants of those buildings.

HPD then redefined the parameters of this approach: distressed properties would not be part of tax lien sales, but would instead be transferred to new ownership, and rehabilitation would be carried out by the private sector with private financing leveraged with public funds. Commissioner Wright turned to staff from across the agency to form a team that began formulating the program that would become the Third Party Transfer Initiative. This new approach fundamentally changed the City's policy for addressing distressed housing.

In 1996 and 1997 the City obtained legislation that transformed its property tax foreclosure authority in two fundamental respects. First, the new authority allows the City to use the *in rem* foreclosure process to transfer ownership of tax delinquent properties directly to new owners without taking title itself, avoiding the cost of managing the properties and preparing them for sale.[13] Further, the new authority permits the City to initiate *in rem* actions in geographic areas as small as a tax block, roughly equivalent to a city block.[14] HPD thus can use its foreclosure authority strategically to address critical buildings and blocks and to complement its ongoing *in rem* disposition and neighborhood reinvestment initiatives. The process focuses on troubled buildings with problems that go beyond tax arrears and provides quick and effective intervention to turn them around and to improve conditions for the tenants.

[10] Arthur Anderson and Anderson Consulting, "Breaking The Cycle: Developing an Effective Intervention Strategy for Dealing with New York City's In Rem Housing Problem, Cost of Ownership Model," 12 April 1995, p. 8.

[11] Braconi, p. 100.

[12] Moon Wha Lee, "Housing New York City 1996," City of New York Department of Housing Preservation and Development, September 1999, p. 16.

[13] Local Law 37 of 1996 amended the Administrative Code to give the City the authority to sell tax liens.

[14] Local Law 69 of 1996 amended the *in rem* process to allow sub-borough actions and make third party transfers.

## Program Overview

The principal goal of the Third Party Transfer Initiative is to improve the housing conditions and quality-of-life of New York City residents, particularly those living in the most dilapidated buildings. To accomplish that goal, the Third Party Transfer Initiative changed a property tax law to avert long-term City ownership and instead uses a standard tax foreclosure mechanism to transfer ownership of abandoned and distressed properties from neglectful owners to responsible new owners. The resulting process quickly and cost effectively conveys buildings to pre-qualified new owners, uses public resources to leverage private capital for complete building rehabilitation, and thus preserves and rehabilitates the City's existing housing stock.

**Figure 2. Projected Disposition of HPD Properties**




Under the new authority, *in rem* foreclosures for Tax Class 2 multiple dwellings of four or more units can occur when owners have a year or more of tax and municipal charge delinquencies. One- to three-unit buildings must have three years of delinquency. After the City obtains a foreclosure judgment, owners are provided a final four months to resolve the arrears, after which time, subject to City Council review, the City may transfer title of unredeemed properties to qualified new owners.

Neighborhood Restore, a non-profit entity established by the Enterprise Foundation and the Local Initiatives Support Corporation, assumes interim ownership and, in turn, transfers ownership to new for-profit and not-for-profit owners selected by HPD through a Request for Qualifications (RFQ) process. The prospective owners manage the properties and secure rehabilitation financing prior to the final transfer, expected within one year of initial conveyance. Neighborhood Restore provides technical assistance to and oversees management by the prospective owners.[15]

By transferring ownership from ineffective, irresponsible owners to capable owners who will upgrade the buildings, this new initiative breaks the old cycle of disrepair and abandonment and ensures that troubled housing is not written off. In contrast to an enforcement policy that relied on long-term City management and subsidy, this Initiative strategically uses government intervention and resources to facilitate the return of residential building ownership to the private real estate sector.

The Third Party Transfer Initiative design is geared to working with the occupancy and rental characteristics of the properties to maximize both the affordability for existing tenants and economic viability for the new owners. To the extent that the properties include vacant units, they will be leased at market rents when rehabilitation is completed. Setting the vacant units at market levels provides additional income to mitigate the need for rent increases for the occupied units. Rents on occupied units are

[15] Memorandum of Understanding between The City of New York and Neighborhood Restore Housing Development Fund Corporation, 2 August 1999.

not increased until the completion of rehabilitation, with a goal of implementing the lowest possible increases to cover post-rehabilitation project costs.

The City has completed the Pilot round of the Third Party Transfer Initiative in the South Bronx and is currently implementing additional rounds.

***Legislation [now] allows the City to use the foreclosure process to transfer ownership of tax delinquent properties directly to new owners without taking title itself, avoiding the cost of managing the properties and preparing them for sale.***

## Taking It to the Neighborhood: The South Bronx Pilot

In June 1997, the City initiated the first pilot *in rem* action against 174 tax delinquent properties in tax map Section 10 of the Bronx, which includes portions of the Hunts Point, Longwood, Melrose, Morrisania, Mott Haven, and Port Morris neighborhoods. The area was targeted by HPD for the Pilot round because it is a region of the city with significant distressed property as well as substantial prior City investments in housing. On August 11, 1999, 46 of the properties (27 buildings and 19 vacant lots) in the South Bronx were transferred to Neighborhood Restore, with interim management provided by the designated owners.[16]

The Bronx Pilot provides important results of the implementation of the Third Party Transfer Initiative. The first measure of the Initiative's success is the collection of delinquent taxes for properties included in the action. At the end of the repayment period, a total of 87 owners had either paid their taxes or entered into a payment agreement with the Department of Finance. The total value of the taxes collected from those properties thus far is more than $6.4 million.[17] Some owners were also required to enter into building repair agreements with HPD. As the initiative becomes known more widely, the City expects the prospect of and subsequent filing of City foreclosure actions to be a significant impetus for owners to address their tax delinquencies.

The initiative's second measure of success is the transfer of 46 properties to responsible new owners. The properties were taken from irresponsible owners who had failed to maintain them adequately and were transferred to responsible new for-profit and non-profit owners with established track records as property managers and a demonstrated ability to address building repairs and other needs.

Neighborhood Restore and the new owner/managers stabilized the buildings, removed Housing Maintenance Code violations, and formalized rent structures with the tenants. For example, one of the first steps taken by Neighborhood Restore and the new owner/managers was to survey all the occupied units with children under the age of seven for possible hazardous lead paint conditions. The new owners safeguarded the health of the children by immediately correcting all the potential problems in accordance with local lead paint requirements. Tenants in two buildings on East 167th and 168th Streets had long suffered inadequate heat from a failing boiler. The new owner of the properties immediately replaced the boilers, and over the course of the 1999-2000 winter the tenants enjoyed adequate heat for the first time in many years.

Neighborhood Restore required the owner/managers to inspect all roofs to determine whether they were water tight and to make necessary repairs, and to identify apartments where young children reside to ensure child window guards are in place. Other repairs made during Neighborhood Restore's interim ownership period included elevator brake replacement, sewer line cleaning, rodent treatment, floor repair, repair of water leaks, lock replacement, and appliance repair and replacement.

[16] Two additional properties were included later, bringing the total to 48. Fourteen properties were removed from the pilot for legal or technical reasons.

[17] City of New York Department of Finance records as of 10 August 2000.

In addition to physical repairs, many other management responsibilities had been neglected at these properties. Many leases had lapsed and had not been renewed, and rents were not consistently collected. Within several weeks of Neighborhood Restore's taking interim ownership, the new owner/managers surveyed all tenants to determine the status of leases and to complete necessary registrations. Since the goal of the Third Party Transfer Initiative is not to displace the residents, but to stabilize rent collections, the owner/managers reviewed individual rent histories and established a fair rent on the units where there was no prior legal rent. When there were cases where rents could have been legitimately increased, but doing so would have created a hardship for the residents, lower rents were adopted.

While addressing the most pressing needs, the new owners and Neighborhood Restore were also preparing the properties for final transfer. The owner/managers worked with Neighborhood Restore, HPD, and the participating lending institutions to develop the scope of rehabilitation work for each building, and to secure the financing to fund those renovations. Within the first year of Neighborhood Restore's interim ownership, the new owner/managers conducted joint site walk-through inspections, identified construction costs, submitted plans to HPD for approval, developed construction documents, and sought Department of Building approvals for rehabilitation.

In August 2000, Neighborhood Restore completed the transfer of 15 multi-family buildings, containing over 270 units, to the new owners. The full rehabilitation of these buildings is underway and will be completed within a 12-month period from that date of transfer. Typically this may include replacing one or more of the heating, electrical, and plumbing systems, as well as addressing structural and building envelope issues. In addition, units are being completely rehabilitated, which includes repairing and replacing windows, walls, doors, appliances, and kitchen and bathroom fixtures.

In one of the Bronx Pilot properties, 1203 Fulton Avenue, residents described the impact of the Third Party Transfer Initiative on their building and their lives. One elderly tenant, Ethyl Moses, said, "For the past 10 years this building has been in terrible condition. When the new owner came in they started making major repairs. They did the floors, they replaced the windows and doors, and they are redoing the bathroom and kitchen. It is wonderful and I am very grateful that these repairs are being made. I will finally have a nice place to live." Another long time tenant, Claris Morgan, observed, "Everything in poor condition is being replaced. They are doing a beautiful job. In 1973 the building was the best kept in the Bronx but it just went down horribly. Now it is coming back to what it was before. It is making a big difference in my life."[18]

Neighborhood Restore has worked with HPD to identify appropriate uses for the vacant lots conveyed through the action. First, citywide and Bronx-based not-for-profit organizations were contacted to solicit their interest in purchasing lots for housing or other community development purposes. As a result, the New York City Housing Partnership is developing several of the lots through its homeownership construction program. Neighborhood Restore also wrote to owners whose homes are adjacent to the lots, asking if they are interested in purchasing them to expand the open space surrounding their housing. Some owners are following through on this offer. One lot is expected to be added as open space for the community through the New York Restoration Project, and another lot will be used as a vegetable garden for residents of an adjacent city-run AIDS facility. Neighborhood Restore is also working with a devel-

[18] Author's telephone conversations with the tenants on 14 September 2000.

oper who hopes to purchase a number of lots for redevelopment housing; a restrictive covenant will ensure that affordable housing is created.

The remaining small clusters of 1- to 4-unit properties will be transferred to the new owners later this year. As with the other properties, all the buildings will be rehabilitated and restored to compliance with the Housing Maintenance Code. When the last few properties are transferred later this year, the Bronx Pilot will have saved more than 300 units of scarce affordable housing. For the first time, residents living in 15 multi-family buildings will have safe and sanitary living conditions, families in 12 one- to four-unit buildings will have decent homes, and 19 vacant lots will have been put to constructive uses including new residential housing.

**Figure 3. Bronx Pilot – Final Cost Summary for Multiple Dwelling Clusters**

| Clusters | Units | Construction Cost [a] | Cost per Unit | Total Development Cost | Bank Loan | HPD Loan | HPD Loan/ Unit | Equity |
|---|---|---|---|---|---|---|---|---|
| I | 78 | $3,655,000 | $46,859 | $4,137,658 | $885,000 | $2,755,000 | $35,321 | $497,658 |
| IIA | 53 | 3,047,566 | 57,501 | 3,495,224 | 903,652 [b] | $2,502,582 [c] | $47,219 | $88,990 |
| IIB | 38 | 1,787,071 | 47,028 | 2,213,943 | 538,754 [b] | $1,610,556 | $42,383 | $64,633 |
| III | 90 | 4,755,783 | 52,842 | 5,757,121 | 1,449,229 [b] | $2,468,000 | $27,422 | $1,839,892 [d] |
| IV | 21 | 1,215,378 | 57,875 | 1,450,424 | 240,732 [b] | $1,158,839 | $55,183 | $50,853 |
| **Total** | **280** | **$14,460,798** | **$51,646** | **$17,054,370** | **$4,017,367** | **$10,494,977** | **$37,482** | **$2,542,026** |

[a] Including contingency. [b] HDC providing permanent funding. [c] Includes $1,324,651 HOME funds. [d] LIHTC equity.

## Moving from Abandonment to Effective Ownership: The Process

The Department of Housing Preservation and Development is the agency primarily responsible for the development, implementation, and operation of the process. As the Third Party Transfer Initiative is closely linked to the City's sale of tax liens, the process also involves the Department of Finance and the Law Department.

### *Targeting Properties for Potential Inclusion*

HPD targets properties in neighborhoods where housing revitalization is a critical need, and where the Initiative will enhance other HPD investments. As HPD identifies properties where basic services are lacking, or where owners are grossly mismanaging their buildings, they are added to the list of potential Third Party Transfer Initiative properties. Such buildings are identified through HPD's Housing Litigation Division, which refers properties it has identified as lacking essential services based on information gathered in its legal enforcement of the Housing Maintenance Code. Referrals may also come from the agency's Emergency Repair Program, which is responsible for correcting hazardous conditions in multiple-unit dwellings when owners fail to make the repairs.

Under Article 7A of the New York State Real Property Actions and Proceedings Law, to safeguard the health and safety of the tenants, a court may appoint an administrator to take over the day-to-day management of a multiple dwelling if its owner has effectively abandoned the property. These buildings are often among the most dilapidated properties in the City. For "Article 7A" buildings in particular, the Third Party Transfer Initiative brings a long-term solution to seemingly intractable situations.

The New York City Department of Housing Preservation and Development can be accessed online at www.nyc.gov/hpd.

Under HPD oversight, the court-appointed administrator uses the rent roll to stabilize the building. More substantive repairs, such as roof or boiler replacement, are paid for by HPD, and the costs become liens against the buildings. While this addresses the building's immediate problems, the long-term problems often remain. For many 7A buildings the Third Party Transfer Initiative is the solution because the new owner will comprehensively address the building's problems and restore it to health and long-term viability.

A property must have tax and municipal charge delinquencies to be eligible to be included in an *in rem* foreclosure leading to third party transfer. For most tax delinquent properties in fair or good condition the City sells the tax lien. The liens are sold to a trust, which uses them as collateral to issue bonds. The trust sells the bonds to investors for cash, and the cash is used to pay the City for the liens. When the Department of Finance issues the list of properties slated for tax lien sales, HPD field staff review the list and exclude those that need additional intervention through programs such as the Third Party Transfer Initiative.

HPD first determines if any properties must be excluded from the tax lien sale because they meet the statutory definition of distressed as established by Local Law 37 of 1996. Statutorily distressed properties are currently defined as those with

- a 15 percent or more tax lien-to-market value ratio
- *and* 5 or more hazardous Housing Maintenance Code violations (Class B), *and/or* 5 or more immediately hazardous Housing Maintenance Code violations (Class C) per dwelling unit
- *and/or* $1,000 or more in HPD Emergency Repair Program liens per building.[19]

The law also gives HPD discretionary authority to exclude from the tax lien sales properties it deems distressed. Finally, HPD excludes properties that are already the subject of other programmatic HPD intervention or rehabilitation efforts or that are ineligible for other reasons.

Together, the properties targeted by HPD and those excluded by HPD from the tax lien sale form a pool of properties for inclusion in a Third Party Transfer *in rem* foreclosure actions.

### *Foreclosing on the Properties*

Once properties are identified for an upcoming *in rem* foreclosure action, the owners are given a pre-foreclosure warning (the Notice Of Possible Foreclosure) and the opportunity to pay their property tax or municipal charge delinquencies. Owners can pay the debts in full or enter installment agreements with the Department of Finance. Either payment arrangement eliminates the inclusion of the property in the formal filing of the *in rem* action, which is the first step towards transferring ownership of the property. The Department of Finance offers favorable terms for installment plans entered into at this stage of the process. Exact terms depend upon the amount of the initial payment and length of the delinquency, but installment payments can be made over a period as long as eight years.

Approximately two months later, the Department of Finance requests that the Law Department file an *in rem* foreclosure action with the New York State Supreme Court against those properties that have not made any arrangements to pay their delinquent

[19] When inspections determine an emergency condition exists, the owner of the building is notified and instructed to repair the condition. If the owner fails to make the repair HPD will repair the problem through the Emergency Repair Program (ERP) and impose a lien to recover the cost.

taxes. After filing of the foreclosure motion and prior to issuance of the judgment of foreclosure, owners have continuing opportunities to make payment arrangements. During the pendency of the *in rem* action, owners who want to execute an installment agreement with Finance must meet the following conditions: compliance with HPD property registration requirements; execution of an agreement with HPD to correct all existing Housing Maintenance Code violations; and an agreement to participate in a housing education program when directed by HPD to do so. During this part of the process, HPD does extensive owner outreach to encourage owners not only to resolve their tax arrears, but also to seek assistance to deal with any physical or management issues affecting the buildings' underlying viability.

At the conclusion of the initial action filing period, the Department of Finance transmits the addresses of the remaining properties to the Law Department, which formally makes a request for a judgment of foreclosure to the New York State Supreme Court. The length of time it takes to render judgment is under Court control but may take as little as a day or several months.

When the final judgment of foreclosure has been entered, DOF notifies the owner and parties at interest that there is a final four-month mandatory redemption period in which to pay any outstanding taxes and other liens and thus retain title to the property. Property owners who have waited until the *in rem* judgment is obtained to enter into agreements with the Department of Finance are offered less favorable terms. Fifty percent of the delinquent taxes and liens must be paid before entering into the agreement, with the remainder paid in full within four quarters. Further, to obtain an installment agreement after judgment, the required HPD recommendation is based on an expanded review, which considers such other factors as the owner's history of ownership/management of this and other properties, record of Housing Maintenance Code violations, lien or mortgage foreclosures, tenant complaint history, ability to manage and improve the property, and financial capacity.

***Tenants in two buildings on East 167th and 168th Streets had long suffered inadequate heat from a failing boiler. The new owner of the properties immediately replaced the boilers, and over the course of the 1999-2000 winter the tenants enjoyed adequate heat for the first time in many years.***

***Transferring the Properties***

At the beginning of the final redemption period, HPD distributes tenant letters to every known tenant in the affected buildings. These letters explain the foreclosure process, advise that the properties may be transferred to new ownership, and provide assurance that their rights as tenants are unaffected.

After the mandatory redemption period has ended, HPD selects a qualified new responsible owner for each property. In the Bronx Pilot round, HPD's review of the RFQ responses was concurrent with the new owner selection period. For subsequent rounds, HPD will already have a pool of qualified owners to draw from.

At this time HPD also determines which properties will be clustered together for sale. HPD clusters properties to provide an optimum mix of vacant and occupied units based on the available foreclosure property inventory. By including several buildings in a single cluster, revenue from filling vacant units can subsidize occupied unit rents. Financing can be developed for clusters that will be less expensive than if the financing were developed for each building individually. HPD also clusters buildings to take advantage of the expertise of specific new owners. For example, one- to four-unit properties or single room occupancies (SROs) may be grouped together and transferred to a new owner with experience rehabilitating that type of property.

Following the mandatory redemption period, HPD has four months to transfer the property to the new owner. This period can be extended up to 45 days for the City Council to review and potentially reject the selection of the proposed new owner of any property. If the title of the property is not transferred within the four month post-judgment period as tolled by the City Council review, title of the property reverts to the original owner.

It would be difficult to complete the transfer within the legislatively required four-month post-redemption period were it not for Neighborhood Restore, because of the complexity and time-consuming nature of the property transfer and the process to obtain rehabilitation financing. Neighborhood Restore is a non-profit entity established

## Third Party Transfer Initiative Process

- HPD identifies distressed properties for inclusion **ongoing**

**Pre-Filing 2 - 3 months**

- HPD provides the Department of Finance with targeted tax blocks
- Final Tax delinquency notices to owners of affected parcels

**- - - - - - - - - - - *IN REM* ACTION FILED - - - - - - - - - - -**

**Action Filed** **6-8 months**

- City commences an *in rem* action against property owners in arrears for selected tax blocks
- Outreach by HPD to encourage tax and code compliance
- Installment agreements available subject to HPD conditions
- Judgment of foreclosure requested by City, issued by the New York Supreme Court

**- - - - - - - - - - - - JUDGMENT ENTERED - - - - - - - - - - - -**

**Mandatory Redemption Period** **4 months**

- Owner has 4 months to pay outstanding taxes and other liens and retain title to the property
- Tenant notification by HPD
- Final outreach by HPD
- Installment agreements are available with more limited terms

**Transfer Period** **4 months**

- HPD has 4 months to transfer title, subject to City Council review
- Clusters assembled
- HPD selects the responsible new owners from prequalified pool

**City Council Review** **up to an additional 45 days**

- City Council has up to 45 days to review the proposed new owners, tolling transfer period
- HPD transfers interim ownership to Neighborhood Restore

**Interim Ownership Period** **12 months**

- Neighborhood Restore establishes agreements to use selected new owners as property managers
- New owners/property managers stabilize and manage properties, and develop scopes of work
- Rehabilitation financing packages are developed
- Neighborhood Restore transfers properties to new owners/ rehabilitation loans closed

**- - - - - - - - - - - TRANSFER PROCESS COMPLETED - - - - - - - - - - -**

**Properties are rehabilitated** **12 months**

Case 1:23-cv-09616-LTS Document 17-4 Filed 03/29/24 Page 12 of 21


by the Enterprise Foundation and the Local Initiatives Support Corporation to assist the City with the Third Party Transfer Initiative. HPD initially conveys the properties to Neighborhood Restore as interim owner. This arrangement provides an opportunity to stabilize the properties, arrange rehabilitation financing, and to prepare the legal documents for final transfer to the new owners. Neighborhood Restore arranges and formalizes agreements with the qualified new owners who act as property managers (owner/managers) during the period of Neighborhood Restore's interim ownership. As an additional benefit, Neighborhood Restore also provides technical assistance to the prospective new owners as they take over the day-to-day management of the properties in preparation for the final transfer.

The website for the Enterprise Foundation is www.enterprisefoundation.org.

During the Neighborhood Restore ownership period the owner/managers operate, manage, lease, and direct the operations of the properties. Their first responsibility is to inspect the properties to identify hazardous conditions, comply with lead paint regulations, and determine which repairs need immediate attention and which can be deferred for inclusion in the overall rehabilitation. The owner/managers also canvass the properties to identify the current occupants and attempt to obtain copies of their current leases. Finally, they work with Neighborhood Restore to update leases, enter new leases, and begin legal proceedings against unlawful residents.

While this is occurring, the owner/managers establish the scope of work required for each individual property. The proposed scope of work is reviewed by HPD and the lending institution(s) participating in the rehabilitation financing. A final walk-through inspection of the building is conducted by all the parties involved before the rehabilitation financing is underwritten and finalized. Once the rehabilitation financing is in place, Neighborhood Restore transfers title of the property to the new owners, and the construction closing takes place, completing the Third Party Transfer process.

***One elderly tenant said, "For the past 10 years this building has been in terrible condition. When the new owner came in they started making major repairs.... It is wonderful and I am very grateful.... I will finally have a nice place to live."***

***Selection of New Responsible Owners***

The Request for Qualifications (RFQ) to identify prospective new owners for the Bronx Pilot met with an overwhelming response—more than 120 requests for participation were received from a wide variety of for-profit and non-profit owner/developer entities. From that group, 69 were qualified as eligible new owners. The new owners eventually selected for the Bronx Pilot included two for-profit owners with substantial experience in turning around distressed property, two locally based non-profits, and two citywide non-profits, one of which focuses on tenant-controlled housing.

For-profit and non-profit ownership entities interested in becoming new owners of transferred properties through the Third Party Transfer Initiative must demonstrate residential management experience, experience in rehabilitation of occupied residential property, financial capacity, and the capacity to carry out the work. Other properties they own must be current, within two quarters, with all property and water and sewer charges or be addressed by current tax repayment agreements. Finally, they can be rejected if adverse findings are made regarding a variety of issues, including tax delinquencies, mortgage arrears or insolvency, record of Housing Maintenance Code violations, tenant harassment, illegal activities, negative history with HPD, etc.

Non-profit organizations may also apply on behalf of tenants interested in owning the properties. The non-profit organization would take ownership initially and transfer the property to the tenants after rehabilitation and a period of stable management.

In April 2000, HPD issued a second RFQ, which included a number of changes to simplify and improve the application process. Applicants who were qualified under the first RFQ can affirm their continued interest. Of the more than 150 responses to the second RFQ, approximately one-third were respondents reaffirming their interest. Entities that have participated in relevant HPD rehabilitation or development programs during the last five years are provided an abbreviated application. While respondents to the first RFQ were scored, respondents to the second RFQ will be identified only as qualified or unqualified.

***For-profit developers want to become owners of properties that will be made economically viable and become worthwhile assets…. Not-for-profit organizations participate because of the prospect of…assisting the residents and strengthening the neighborhoods in which they work.***

One of the lessons learned from the Bronx Pilot is that the new owners must have the ability to obtain private financing and to provide equity for rehabilitating the properties. As part of the second RFQ, HPD has placed a greater emphasis on financial capacity. HPD also evaluates credit histories and financial and other references.

In their applications, respondents are allowed to express a preference for specific properties and for properties in specific neighborhoods. However, there is no guarantee that they will be selected for those properties. When assigning properties from the qualified owner pool HPD considers additional factors, including proximity of the Third Party Transfer Initiative properties to properties already owned by the potential new owner, the potential new owner's experience developing and managing similar properties, and the potential new owner's ability to work with government agencies. HPD will continue to use the pool of applicants qualified through the second RFQ for future Third Party Transfer Initiative rounds and will issue additional RFQs on a periodic basis.

### *Incentives for Participants*

There are a number of reasons for both for-profit and not-for-profit organizations to participate in the Third Party Transfer Initiative. For-profit developers want to become owners of properties that will be made economically viable and become worthwhile assets, and often desire to strengthen neighborhoods where they have previous investments. Not-for-profit organizations participate because of the prospect of rehabilitating and preserving affordable housing and thereby assisting the residents and strengthening the neighborhoods in which they work.

Qualified new owners acquire what will be viable properties at a low cost. The costs are minimal compared to buying and rehabilitating a property on the open market because the new owner's equity investment is targeted for rehabilitation, not acquisition. In addition, the existing liens on the property are cleared, and the building is given a fresh start. As a result, the debt service will be lower than for a comparable building acquisition, thus reducing the income needed to support the building.

## Financing: Sources and Strategies

Lien forgiveness and cross subsidization of rents may not be enough to ensure the long-term financial viability of the properties, many of which require extensive rehabilitation. The City leverages private market rate loans with City rehabilitation funds to reduce rehabilitation costs and provides a variety of short and long-term tax incentives.

HPD has several programs that use low interest loans to rehabilitate properties where rents and tenant incomes are too low to support market-rate financing. For the multi-family property clusters, the Third Party Transfer Initiative will generally provide rehabilitation funding support through HPD's Participation Loan Program (PLP). PLP was originally created in the mid-1970s to reverse the deterioration of low- and moderate-income neighborhoods by leveraging low-cost City funds with market-rate financing provided by various New York City lenders. It operates primarily for buildings of 20 or more units needing moderate rehabilitation including replacement of building systems and modernization of apartment interiors. As such, it is an ideal mechanism for the Third Party Transfer Initiative.

PLP blends City financing at 1 percent, in combination with federal funds where appropriate, and market rate financing from banks and other private lenders, significantly reducing the cost of the rehabilitation loan. Because of the lower cost, rent increases for occupied units in properties rehabilitated through PLP, including those in the Third Party Transfer Initiative, are typically limited to $5 to $10 per room.[20]

Through the Neighborhood Homes Program, HPD conveys occupied one- to four-family buildings to selected community-based not-for-profit organizations for rehabilitation. The new owners will receive funding in the form of an evaporating loan from HPD and a loan from the Local Initiative Support Corporation. Once the rehabilitation is completed, each building will be marketed to the existing tenants or other buyers who agree to reside in the building and who qualify for mortgage financing to purchase the property.

In addition, the City offers tax incentive programs that reduce the cost of operation prior to and after rehabilitation. Reducing the tax burden on the rehabilitated properties reduces the cost of operating the buildings, and reduces the pressure to increase rents, thus allowing occupied units to remain affordable.

Initially, the City seeks approval from the City Council to exempt the properties from property tax. At the same time the City Council reviews HPD's new owner selection determination. With City Council approval, during the approximately one year of Neighborhood Restore ownership the properties are provided a full property tax exemption. Neighborhood Restore is a non-profit eligible for this tax exemption under Article XI of the New York State Housing Finance Law.

HPD also requests that the City Council approve the designation of the properties as Urban Development Action Area Projects (UDAAP). The Urban Development Action Area Act was specifically enacted "to provide incentives for the correction of [such] substandard, insanitary, blighted, deteriorated or deteriorating conditions" associated with *in rem* housing.[21] UDAAP designation confers tax exemption on the building improvements portion of the property taxes for up to 20 years, with 10 years of full exemption and a 10-year phase-out to full taxes. During the period of UDAAP tax exemption, the land portion of the taxes remain in effect.

[20] Under HPD's delegated processing procedures, the private lender is given primary responsibility for loan underwriting and processing. In general, the City's share of the financing, including federal funds, is 65 percent of the total financing. The total City and private lender financing cost is generally limited to 90 percent of the total project development cost, with a maximum term of 30 years.

[21] Section 691. Policy and purposes of article, Article 16, Urban Development Action Area Act, New York City General Municipal Law.

### Selected Properties from the Second Round of the Third Party Transfer Initiative

**139 West 128th Street, Manhattan.** 16-unit building, which though listed as vacant, is currently occupied by a number of residents; 565 hazardous and immediately hazardous housing violations of record ("B" and "C" violations); $269,642 in liens. Referred for inclusion by HPD's Housing Litigation Division.

The building has an open front door and graffiti on the first level facade. Some apartments are missing entrance doors, the public stairway is unstable, plywood covers openings in the walls, and there are exposed and dangling light fixtures. Apartments have a range of severely deteriorated conditions, from collapsing ceilings to walls open to plumbing and electrical systems.

**213 West 111th Street, Manhattan.** 24-unit occupied building; 721 B and C violations; $775,545 in liens. Included in current action as part of HPD's Harlem Gateway initiative for deteriorated buildings near Central Park North where HPD has made major housing investments through other programs.

This building has severely deteriorated apartment conditions, including floors and walls in bathrooms damaged as the result of water leakage, as well as inadequate heat and hot water. Public areas are badly decayed, with dangerous stairways, debris, and open doorways.

**370 Lenox Avenue, Manhattan.** 39-unit building with vacate order but with some families still living in the building; 663 B and C violations; $1,882,711 in liens; referred through the 7A Program as a building too devastated to be appropriate for the scope of stabilization services provided by that program.

A fire in May of 1998 destroyed the top three floors of the building, and a vacate order was placed on the building. Some tenants moved back in, even though there is no heat or hot water, public areas are in extreme disrepair and many apartments are in shambles. Extensive drug activities take place within and outside of the building. A local community group has been working with HPD to relocate families so that the building can be sealed until rehabilitation is made possible through the Third Party Transfer Initiative.

Once rehabilitation is completed, HPD is able to confer alternate ongoing tax exemption and abatement through tax incentive programs such as its J-51 program.[22] J-51 provides for a range of tax benefits, including up to 34 years of tax exemption from the increase in real estate taxes resulting from the improvements. The program also allows for the abatement of a percentage of the annual tax bill for up to 20 years. The amount of the benefits depends on the level of rehabilitation work, and for the Third Party Transfer Initiative will generally be 150 percent of the certified reasonable cost.

Preparing the rehabilitation financing packages is difficult, as HPD has extremely limited control over the characteristics of the buildings and tenants that become part of the final transfer portfolios. Each building has unique physical repair and rehabilitation needs, requiring different levels of capital investment. Depending on factors such as vacancy rates, tenant income, and capital needs, various financing sources must be identified and blended together. As a result, financing packages must be first tailored to each building's individual needs, and second to support other buildings in the same cluster.

[22] Section 11-243 of the Administrative Code of the City of New York (formerly Section J51-2.5).

The process can also be challenging because of the lack of early or complete information on the physical and capital needs of the buildings. Given the adversarial nature of the *in rem* foreclosure proceedings, the prior owners are often uncooperative. As a result, HPD may be unable to gain sufficient access to the interior of the foreclosed buildings until title has been transferred. At times, HPD has to cluster properties and identify new owners without the physical inspections or property profiles necessary to inform cluster financing decisions fully.

Because the City is committed to rehabilitating every building transferred through the initiative, HPD cannot eliminate those with high subsidy requirements. The financing packages must ensure affordable rents for low-income residents without relying on rent subsidies, and must also ensure that rehabilitation addresses building conditions and long-term needs. Further, the new owners have varying access to private capital. As the buildings have significant capital needs and there are finite government funding resources, the financing packages are more feasible when the new owner has greater access to private capital.

### *Funding*

Funding for the Third Party Transfer Initiative comes from a variety of sources, private and public. The new owners provide equity and obtain private financing from banks and financial institutions. The private financing obtained by the new owners is blended with City Capital Budget funds to reduce the total financing cost and ensure the rehabilitation remains affordable. Federal housing funds, such as HOME program funds, and Low Income Housing Tax Credit equity may also be included to reduce the overall cost and make the process possible.

Because each round of Third Party Transfer Initiative properties will have buildings with different characteristics and rehabilitation needs, the sources and amounts of funds for each round will be different. For the Bronx Pilot round of the Third Party Transfer Initiative the funding sources are shown in figure 4.

**Figure 4. Bronx Pilot Funding Sources**

| Funding Type | Amount | % of Total |
|---|---|---|
| Federal | $3,333,651 | 15.1 |
| City Capital (loans) | 10,460,326 | 47.5 |
| Other City (loans) | 3,132,367 | 14.2 |
| Private | 5,107,026 | 23.2 |
| **TOTAL** | **$22,033,354** | **100.0** |

Rehabilitation of the properties transferred in the first round cost an average of $60,908 per dwelling unit for properties with 5 or more units. Rehabilitation of the smaller buildings cost an average of $106,071 per dwelling unit. Program costs also include $2,009,000 to establish and operate Neighborhood Restore for the first year. Future costs will be less as the one-time cost of establishing Neighborhood Restore will not be included.

### *Funding Sources*

*Multiple Dwellings* – 16 properties with 283 pre- and 280 post-rehab units divided into 4 clusters with rehabilitation costs of $60,908 per unit. Funding sources are shown in figure 5.

**Figure 5. Multiple Dwellings Funding Sources**

| | |
|---|---|
| City Capital | $9,170,326 |
| Federal HOME | 1,324,651 |
| Other City (HDC) | 3,132,367 |
| Private (owner equity, bank financing, tax credit equity) | 3,427,026 |

**Figure 6. Smaller Buildings Funding Sources**

| | |
|---|---|
| City Capital | $1,290,000 |
| Private (from LISC/Enterprise; repaid when private bank financing obtained) | $1,680,000 |

*Smaller Buildings* – 12 properties with 28 units divided into 2 clusters with rehabilitation costs of $106,071 per unit. Funding sources are shown in figure 6.

While all six clusters in the Bronx Pilot utilize City capital funds and some type of private financing, no two clusters use the same combination of funding sources at the same level, or in the same way. Each financing package is tailored to the economic and physical conditions of the buildings, as well as the sophistication of the new owners. The clusters with small buildings use funds from LISC/Enterprise that will later be repaid with private bank financing, although one of those clusters requires significantly more subsidy than the other. One of the multiple dwelling clusters utilizes federal HOME funds, while another uses tax credits. Three of the four multiple dwelling clusters will use reserve funds from the City's financing agency, the Housing Development Corporation, allocated specifically for HPD anti-abandonment housing initiatives, while the fourth uses only City Capital funds and private financing.

## COSTS AND BENEFITS

The Bronx Pilot provides important information about the cost avoidance possible through the Third Party Transfer Initiative. Had the City taken ownership of the 174 properties under the prior *in rem* foreclosure approach, and stayed in City ownership for an average of 19 years, it would have cost the City as much as $382.8 million to manage and dispose of those properties.[23] Through the Third Party Initiative, the City avoided this cost by returning the buildings to tax paying status with responsible new owners, and leveraging its financing with private sector funds to achieve building rehabilitation.

A further benefit of the Third Party Transfer Initiative is the short turnaround time for the buildings to be transferred to new owners. For the first group of properties, from the date the properties were included in the *in rem* action to the date of the final transfer was just 26 months.

Savings from the Third Party Transfer Initiative will reduce the need to rely on scarce federal Community Development Block Grant (CDBG) funds to pay for repairs and rehabilitation of *in rem* properties. The New York City Independent Budget Office noted, "Maintenance of *in rem* properties is consuming a declining share of CDBG spending each year, from a peak of $154.8 million in 1996, down to $75.8 million in 1999. As spending on *in rem* properties has declined, CDBG funds used to support private housing preservation have risen, from $6.5 million in 1993 to $42.2 million in 1999."[24]

[23] Based on an average of $2.2 million per property to acquire, manage, repair, and dispose of as per Arthur Anderson report "Breaking the Cycle."

[24] "Inside the Budget," City of New York Independent Budget Office, 31 July 2000, pp. 1-2.

### Personnel Costs

Across HPD's divisions, at the Department of Finance, and the Law Department, numerous staff were involved in implementing the Third Party Transfer Initiative. Most of the work was such that it could be performed by existing staff and be absorbed into their already established responsibilities.

The HPD staff who spend 100 percent of their time on the Third Party Transfer Initiative include a Program Director and three support staff responsible for pre-transfer coordination and programmatic reporting; and a Project Manager responsible for reviewing financial packages and coordinating closings. In addition, a Director of Analysis, a Program Director, and two Senior Executive staff spend from one-quarter to one-third of their time managing and overseeing work related to the Third Party Transfer Initiative. Finally, the Office of Anti-Abandonment estimates its borough office staff collectively spend approximately 15 percent of its time on activities including: assessing properties for signs of distress, conducting owner outreach and assistance to encourage owners to resolve their taxes and obtain assistance to deal with any physical or management issues affecting the buildings' underlying viability, and contacting tenants in properties where ownership will be transferred.

***A benefit of the Third Party Transfer Initiative is the short turnaround time for the buildings to be transferred to new owners.***

To provide a very rough idea of implementation costs, HPD estimated the percentage of work time spent by the HPD staff primarily responsible for the initial implementation of the program. Those percentages applied against salaries for the staff involved yielded an estimate of personnel costs for program implementation of $523,000.

## OVERCOMING OBSTACLES AND SKEPTICISM

When the Third Party Transfer Initiative was proposed, the most significant obstacle it faced was obtaining legislative approval. The Council was concerned about how the City would identify distressed properties for the Initiative, and how it would select new owners.

HPD established a mechanism to identify distressed properties based on level of tax arrears, lien-to-market value ratio, and the extent of serious housing code violations. To identify responsible new owners, the City established a competitive process, including a wide outreach to the for-profit and non-profit real estate communities. HPD met with many key Council Members to explain these approaches and satisfy their concerns.

The City also recognized the importance of input from other individuals and organizations that would be affected and ultimately would have to agree to the new program. HPD's team engaged these interested parties early on by aggressively reaching out to other City departments including the finance, law, and budget agencies. The team also engaged in dialogues with other elected officials, community groups, neighborhood task forces, community boards, non-profits, and religious organizations. The team established program guidelines and worked with the City's budget office to obtain rehabilitation financing. All this support was necessary to gain the community backing needed to put a new program in place and obtain the necessary legislation.

As the Third Party Transfer Initiative has been implemented, a further obstacle has been occasional tenant resistance and the belief among some tenant groups that they have not had equal opportunity to become the new owners. HPD is solely concerned with selecting the new owner that is most qualified and best able to rehabilitate and stabilize the property, whether that is a private sector developer, not-for-profit organization, or a tenant group. Given the need for quick transfers and the advanced state of deterioration of many Third Party Transfer Initiative properties, the City needs to count on the experience, financial resources, and capacity of the established for-profit and not-for-profit ownership community to manage, develop, and promptly rehabilitate the properties. However, interested tenants have the opportunity to link to qualified not-for-profit owners with the potential to convert the properties to tenant control after rehabilitation is completed and the property operation has been stabilized.

***The Third Party Transfer Initiative is highly replicable. It uses government tax enforcement tools, flexible financing, is cost effective, applies to a broad range of neighborhood and property conditions, and can use local resources to adapt the program to local conditions.***

Tenant resistance is unlikely to be as great an obstacle in another city. Because of several unique factors, tenants probably have greater influence in New York City than in other large municipalities across the country. "Unlike most other American cities, New York City is overwhelmingly a city of renters. According to the 1993 American Housing Survey, 49.1 percent of all households in central cities owned the homes in which they lived. In New York, however, only 30 percent of all housing units were owner occupied in 1996."[25] Moreover, the 1999 vacancy rate in New York City was 3.19 percent.[26]

Further, there is a history of tenant ownership within New York City, including tenant ownership models with HPD program support. One of the programs to rehabilitate and dispose of City-held *in rem* housing gives tenants with a significant interest in tenant ownership the right to assume direct management and eventual ownership before other program options are considered. New York City has also long been a national center for residential cooperative ownership, with cooperatives at all income levels—ranging from luxury high-rises, to City- and state-assisted middle-income projects, to small low-income sweat equity ventures.

## REPLICATION

The Third Party Transfer Initiative is highly replicable. The Initiative uses government tax enforcement tools, flexible financing, is cost effective, applies to a broad range of neighborhood and property conditions, and can use local resources to adapt the program to local conditions.

Financing for the initiative is also easily replicated. Building rehabilitation can be easily supported by a wide variety of public and private sector funding sources. Depending on their needs, municipalities can blend federal, state and/or city, and private funds to finance the rehabilitation of dilapidated units. Each community can use its established real estate community.

The initiative's cost savings and cost avoidance features are also replicable because leveraged public funds make blended public and private sector financing packages affordable. The costs of administering the program are recovered manyfold from increased tax collection, buildings returning to the tax rolls, and from savings realized from restoring distressed housing to good health.

[25] Michael H. Schill and Benjamin P. Scafidi, "Housing Conditions and Problems in New York City," in Michael H. Schill (ed.), *Housing and Community Development in New York City: Facing the Future* (Albany, NY: State University of New York Press, 1999), 19.

[26] "1999 New York City Housing and Vacancy Survey," 14 August 2000, p. 4.

### Resources Needed

The actual costs for each municipality will depend on the level of staffing, how the transfer process is structured, and the degree of distress of the properties. For New York City there was the initial $2-million cost of establishing and operating Neighborhood Restore. Other municipalities may not need to fund an interim owner.

The per-unit cost to rehabilitate individual apartments depends on the degree of distress, the size of the building, and on local construction costs. In the case of the Bronx Pilot, the per-unit rehabilitation cost ranged from $60,000 to $100,000 depending on the size of the building. However, the per-unit costs will likely be significantly less for other municipalities. According to a recent study by the New York University School Center for Real Estate and Urban Policy, the cost of residential construction in New York City is the highest in the nation.[27]



*Could the Third Party Transfer program be replicated to reclaim abandoned property in Massachusetts urban areas?*

As important as it is to consider the hard costs, to replicate the Third Party Transfer Initiative a municipality will also need to have or develop less tangible resources such as knowledge and experience with the issues surrounding developing and managing housing; a close working relationship between tax, legal, and housing agencies; and low-interest loan and/or tax incentive programs to reduce the rehabilitation and operating costs so that the properties will be both viable and affordable. Municipalities will also need to identify and establish working relationships with not-for-profit housing organizations, and responsible private sector real estate professionals who have the capacity to become the new owners. Lastly, the municipality will need to have a close relationship with the private sector financial industry that will provide much of the rehabilitation funding.

### Steps to Replication

To replicate the Third Party Transfer Initiative, other municipalities must first determine how they will structure the transfer process, and how they can best utilize public-private partnerships with local government, real estate developers and managers, not-for-profit organizations, and lending institutions. For New York City this meant enlisting the assistance of the Local Initiatives Support Corporation and the Enterprise Foundation to create Neighborhood Restore. Other municipalities may find it more advantageous to create direct relationships with local lending institutions and not-for-profit organizations. For example, another municipality might establish a direct relationship with a local Community Development Corporation to facilitate the transfer and rehabilitation of distressed properties in a particular neighborhood.

Once the transfer structure and strategy have been developed, the municipality must obtain the legislative authority to initiate *in rem* foreclosures and complete third party transfers. Many municipalities already have the ability to initiate foreclosures, and auction or assign tax liens. Those cities can modify that legal mechanism or adapt other legal authority to create a third party transfer process. New York City's Local Law 37 of 1996 can serve as a model on which to develop the legislation.

[27] Jerry J. Salama, Michael H. Schill, and Martha E. Stark, *Reducing the Cost of New Housing Construction in New York City: A Report to the New York City Partnership and Chamber of Commerce, the New York City Housing Partnership, and the New York City Department of Housing Preservation and Development,* New York University School of Law, Center for Real Estate and Urban Policy, July 1999, p. vii.

Lastly, the municipality must identify funding for the structure of the transfer process it creates, and for required property rehabilitation. Whether the municipality completes the process through its local agencies, or establishes a public-private partnership like Neighborhood Restore, funding must be in place to transfer the titles and manage the properties until the transfers are complete.

HPD had numerous low-interest loan and tax incentive programs in place already, which were easily adaptable to the Third Party Transfer Initiative. Other municipalities may have similar programs, or may need to establish programs to ensure the long-term financial attractiveness and viability of the properties. This is important because the building must have sufficient income to cover operating expenses and debt service if the properties are to avoid the cycle of disinvestment and disrepair that leads to tax delinquency and abandonment.

## CONCLUSION

By changing existing legal tax enforcement authority the City was able to use the government power of tax foreclosure to transfer ownership of distressed tax delinquent properties directly to new owners without taking ownership itself. This fundamental change directs the worst housing stock from City ownership and utilizes the experience and flexibility of the existing real estate community to return buildings quickly to sound physical and financial condition.

This achievement provides a targeted strategy for restoring troubled buildings, avoiding and reducing City capital costs, redirecting scarce resources, and shortening rehabilitation time from five years or more to eighteen months. By preventing abandonment and improving substandard housing conditions, the initiative helps to support the City's existing investments in communities throughout the City.

## ABOUT THE AUTHORS



*Christopher Allred*

**Christopher J. Allred** is strategic communications analyst in the Office of Communications at the New York City Department of Housing Preservation and Development (HPD). He joined HPD in March 1999 as a special assistant to the HPD Office of Housing Intervention and Resources. Prior to joining HPD, he worked in Washington, D.C., as a lobbyist on housing, bankruptcy, and other issues for the City of New York and was a congressional staff member. He graduated from Vassar College with a Bachelor's in political science.

**Robin Weinstein** provided substantial assistance with content and editing. She joined HPD as a management intern in June 1973 and has held a variety of positions within the agency, most recently as acting deputy commissioner of the Office of Housing Intervention and Resources.