FILED: APPELLATE DIVISION - 1ST DEPT 12/07/2020 01:34 PM 2020-00708
NYSCEF DOC. NO. 6 RECEIVED NYSCEF: 12/07/2020

*To be Argued by:*
SERGE JOSEPH
*(Time Requested: 15 Minutes)*

# New York Supreme Court

## Appellate Division—First Department

**Appellate Case No.: 2020-00708**

IN REM TAX FORECLOSURE ACTION NO. 52
BOROUGH OF BRONX
SECTIONS 9, 10, 11, 12, 14, 15 and 16
TAX CLASSES 1 AND 2.

THE CITY OF NEW YORK,

*Plaintiff-Respondent,*

– against –

1600 NELSON AVENUE HOUSING DEVELOPMENT FUND CORPORATION,

*Defendant-Appellant,*

– and –

NEIGHBORHOOD RESTORE HOUSING DEVELOPMENT FUND CORPORATION,

*Non-Party-Respondent.*

## BRIEF FOR DEFENDANT-APPELLANT 1600 NELSON AVENUE HOUSING DEVELOPMENT FUND CORPORATION

HIMMELSTEIN, MCCONNELL, GRIBBEN, DONOGHUE & JOSEPH LLP
*Attorneys for Defendant-Appellant*
15 Maiden Lane, 17th Floor
New York, New York 10038
(212) 349-3000
sjoseph@hmgdjlaw.com

Bronx County Clerk's Index No. 40000/15

# TABLE OF CONTENTS

**Pages**


TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

QUESTIONS PRESENTED ........ 9

STATEMENT OF THE CASE ........ 9

A. Background ........ 9
B. The Statutory Scheme at Issue ........ 11

1. The Requirement that Properties Meet Definition of Distressed to Be Subject to "Modified" In Rem Foreclosure ........ 11
2. The Classification of Liens Subject to Foreclosure ........ 14
3. The Mandatory Statutory Notice Requirements ........ 15

C. The City Failed to Comply with the Statutory Requirements ........ 16

1. The Subject Building Was Not "Distressed" ........ 16
2. The Subject Property Did not Meet the Triggering Tax Lien/Value Ratio ........ 16
3. The City Failed to Comply with the Filing, Posting and Publication Requirements ........ 17

D. The City Failed to Serve Appellant with the Notice of Foreclosures; and Could Not Produce Competent Evidence that it did ........ 20
E. The City Entered into Two Installments Agreement with Appellant ........ 20
F. The Default Judgment and Transfer of the Deed ........ 22
G. TPT Program has Targeted Properties in Certain Neighborhoods ........ 24
H. Supreme Court's Decision ........ 26

ARGUMENT

POINT I

SUPREME COURT ERRED IN DETERMINING THAT THE CITY PROPERLY AVAILED ITSELF OF THE IN REN FORECLOSURE PROCEEDING AGAINST THE SUBJECT PROPERTY ....28

POINT II

THE COURT LACKED JURISDICTION TO ENTER IN REM JUDGMENT OF FORECLOSURE AND SALE AGAINST THE SUBJECT PROPERTY ....36

A. The City Failed to Follow the Statutory Mandatory Requirements....38
B. The City Did Not Properly Effectuate Service, thus Denying Appellant due Process ....46
C. Appellant was Denied Due Process Because the City Failed to Serve Appellant with a Copy of the Judgment, thus Denying Appellant the Opportunity to Redeem....49

POINT III

THE CITY'S NEGLECT TO INFORM APPELLANT THAT IT HAD REPUDIATED THE INSTALLMENT AGREEMENTS WAS GROSSLY IN BAD FAITH; ACCORDINGLY, THE CITY SHOULD BE ESTOPPED ....51

POINT IV

THE CONVEYANCE OF TITLE TO THE PROPERTY TO NEIGHBORHOOD RESTORE WAS CONTRARY TO THE COURT'S JUDGMENT AND THE ADMINISTRATIVE CODE; IT IS THEREFORE INVALID AND SHOULD HAVE BEEN SET ASIDE....55

CONCLUSION....58

# TABLE OF AUTHORITIES

## Cases

*AB Medical Services PPLC v. Specialty National Ins. Co.*, 11 Misc3d 144(A), 810 NYS2d 846 (AT, 2nd and 11th Jud. Dist, 2006) ............................................46

*Albany v. Goodman*, 203 AD530, 197 NYS 739 (3rd Dept., 1922).........................43

*Ayers v. Coughlin*, 72 NY2d 346, 530 NE2d 373, 533 NYS2d 849 (1988)............39

*Bender v. NYC Health and Hospitals Corp.*, 38 NY2d 662, 668, 345 NE2d 561, 564, 382 NYS2d 18, 21 (1976),.............................................51,52,53

*Byrnes v. County of Saratoga*, 251 AD2d 795, 674 NYS2d 463 (3rd Dept, 1998)..................................................................................37,38

*Colon v. National Mut. Fire Ins. Co.*, 211 AD2d 579, 621 NYS2d 608 (1st Dept., 1995);........................................................................48

Dorce v United Rentals N. Am., Inc., 78 AD3d 1110, 1111, 915 NYS2d 79 [2010]). ..........................................................................54

*Friedman v. Allcity Inc. Co.*, 118 AD2d 517, 500 NYS2d 124 (1st Dept., 1986). ..48

*La Porto v Village of Philmont*, 39 NY2d 7, 12)..............................................52,53

*Landmark Colony at Oyster Bay v. Board of Sup'rs*, 113 AD2d 741, ....................52

*Lubermens Mut. Cas. Co. v. Comparato*, 151 AD2d 265, 267, 542 NYS2d 179, 181 (1st Dept., 1989),..........................................................................48

*Luka v New York City Tr. Auth.*, 100 AD2d 323, 325, aff'd 63 NY2d 667),..........52

*Matter of 1555 Boston Rd. Corp. v Finance Administrator of City of N.Y.*, 61 AD2d 187, 192). ...........................................................................52

*Matter of County of Seneca [Maxim Dev. Group]*, 151 AD3d 1611, 56 NYS3d 704 (3rd Dept., 2017) ...........................................................38

*Matter of Emporium Mgt. Corp. v City of New York*, 121 A.D.3d 981, 984, 995 N.Y.S.2d 127, 130, (2nd Dept., 2014). ......................................................52,53,54

*Matter of Foreclosure of Tax Liens [ExxonMobile Oil Corp - Hughes]*, 41 AD3d 1243, 839 NYS2d 380 (4th Dept, 2007)..............................................................38

*Matter of Government Employees Inc. Co*, 112 AD2d 226, 227, 491 NYS2d 442, 443-444 (2nd Dept, 1985 .....................................................................48

*Nassau Inc. Co. v. Murray*, 46 NY2d 828, 414 NYS2d 117 (1978) ....................47

*Olds v. Jamestown*, 280 NY 281, 20 NE2d 756 (1939) ....................37,43

*Orange County Commissioner of Finance v. Helseth*, 24 Misc3d 204, ..................49

*People ex rel. New York City Omnibus Corp. v. Miller* 282 NY 5, 24 NE2d 722 (1939), ....................33

*People v. Frudenberg*, 209 NY 218, 103 NE 166 (1913)....................39

*Rem Tax Foreclosure Action No. 53 Borough of Brooklyn, 63 Misc.3d 1207(A), 2019 WL 1431423, at *9 (N.Y. Sup. Ct. Mar. 28, 2019),* ....................5,6,8

*Schultz Management v. Board of Standard and Appeals of the City of New York,* 103 AD2d 687, 477 NYS2d 351, aff'd 64 NY2d 1057, 489 NYS2d 902, 479 NE2d 247....................34

*Stevens v. Breen*, 258 AD 423, 16 NYS2d 909 (2nd Dept., 1940) ....................43

*Szal v. Pearson*, 289 AD2d 562, 675 NYS2d 200 (2nd Dept., 2001)....................38

*Wayman v. Zmyewski*, 218 AD2d 843, 629 NYS2d 871 (3rd Dept., 1995) ............42

*Weil v. Laube*, 235 NYS 14, 134 Misc 454 (Sup Ct., 1929), aff;d 227 AD 729, 236 NYS 919 (2nd Dept., 1929) ....................43

*Welhaven v. Kohn*, 257 AD 744, 15 NYS2d 183 (3rd Dept., 1939)....................43

*Werking v. Amity Estates, Inc.*, 2 NY2d 43, 155 NYS2d 633 (1956) ....................36

**STATUTES**

EPTL § 6-4.6....................56

NYC Admin. Code § 11-401 et seq.....................12,41,44

NYC Admin. Code § 11-401.1 ....................12,29,30,31,32

NYC Adm Code 11-401(4)....................30

NYC Admin. Code § 11-401.1(c)....................9,12, 15,13,33

NYC Admin. Code § 11-401(4)....................30

NYC Administrative Code § 11-401.4, et seq ....................14

NYC Admin. Code § 11-404(a)....30,31

NYC Admin. Code § 11-404(b)....14,17,26,28,31,32

NYC Admin. Code § 11-405 ....15

NYC Administrative Code § 11-405(a)....6,7,8,29,30,31,34

NYC Admin. Code §§ 11-405(d)....29,30

NYC Admin. Code § 11-406(a)....15,38,40

NYC Admin. Code § 11-406(b)....15,36,41,42,43

NYC Admin. Code § 11-406 (d)....18,19,44,45

NYC Admin. Code § 11-412(b)....32

NYC Admin. Code § 11-412.1 ....22,

NYC Admin. Code § 11-412.1(c)....22

NYC Admin. Code § 11-412.1(d)....22

NYC Administrative Code of City of NY § 11-424 [g]. ....54
N.Y. Constr. & Interp. Law § 240 ....34
N.Y. Constr. & Interp. Law § 98(a)....35
NY Const, art 1, § 11 ....6
US Const 14th Amend, § 1 ....6

**<u>OTHER AUTHORITIES</u>**

Oversight - Taking Stock: A Look into the Third Party
Transfer Program in Modern Day New York, N.Y.C.
Council, Comm. on Hous. and Bldg, Comm. on Oversight
and Investigations, Briefing Paper (2019) ....2, 24

NYC Council, Hr'g of Comm. On Hous. and Bldg.,
Comm. on Oversight and Investigations, (July 22, 2019)
Hr'g Tr. at 10 (statement of
Member Ritchie Torres)....3

Jerilyn Perine, Harold Shultz, and Stephanie Marazzi,
"The Invisible Transformation: Turning Debt Into Revenue",
Citizens Housing & Planning Council....10

Andersen Consulting, "Breaking the Cycle:
Developing an Effective Intervention Strategy for Dealing
with New York City's In Rem Housing Problem"
(Study Report, unpublished Andersen Consulting, 1994) ........................................ 10

Siegel Teitelbaum & Evans, LLP, "Broken Promise:
New York City's Tenant Interim Lease" Program and
Those Left Behind (February 11, 2017) ........................................................... 25, 26

Demographic Profile of University Heights, NYC Dept. of City Planning,
Population, Fact Finder ........................................................................... 26

Demographic Profile of University Heights, NYC Dept. of City Planning,
Population, Fact Finder ........................................................................... 26

## PRELIMINARY STATEMENT

This case involves Local Law No. 37, enacted by New York City Council on May 2, 1996 to implement Plaintiff-Respondent New York City's Third Party Transfer Program ("TPT Program"), presently codified as Title 11, Chapter 4 of the New York City Administrative Code.

The TPT Program authorizes Plaintiff-Respondent New York City (the "City") to foreclose on properties affected by tax liens that remain unpaid for the required statutory period and which meet the statutory definition of "distressed". It further permits the City to convey these properties directly to a third party organization for rehabilitation and management - that is, without the City taking ownership and the concomitant responsibility to maintain them. The TPT Program was created in response to the City's lack of resources to address the needs of the abandoned properties it acquired in the 1960s and 1970s through *in rem* tax foreclosures. Since the enactment of the Local Law No. 37, the City has completed ten rounds of property foreclosures and transfers under the TPT Program. The most recent round, Round X, has generated widespread public scrutiny[1] and

[1] See https://www.nydailynews.com/new-york/ny-metro-housing-tpt-20181125-story.html; See also https://brooklyneagle.com/articles/2018/11/26/brooklyn-officials-demand-full-scale-investigation-of-home-theft-in-black-brown-neighborhoods; and https://www.nydailynews.com/news/politics/ny-metro-third-party-transfer-carone-de-blasio-riseboro-20190527-xhyzyj2ksvgxbbqxocmasavf6y-story.html

investigations by various government oversight bodies[2]. These investigations have revealed that many of the properties selected for inclusion in Round X of the TPT Program were concentrated in just 11 neighborhoods, where residents are primarily people of color; many of the properties were not "distressed"; 118 of the 420 properties included in Round X, and 27 of the 65 properties foreclosed and transferred were HDFC Cooperatives; and that many homeowners were not provided with notice and opportunity to redeem their properties.[3] As one public official has observed: "TPT can indeed be a powerful tool for rescuing properties from a spiral of debt and disrepair, but it also could be a blunt instrument when applied too broadly and carelessly."[4]

The instant case exhibits all the hallmarks of the City's blunt and careless application of the TPT Program. Defendant-Appellant 1600 Nelson Avenue, Housing Development Fund Corporation ("Appellant")'s property was seized through Round X of the TPT Program. It owned the subject cooperative building, located at 1600 Nelson Avenue, in the Morris Heights section of the Bronx, New

---

[2] https://www.nysenate.gov/sites/default/files/article/attachment/a_legislative_report_on_the_hearing_regarding_the_crisis_facing_homeowners_in_brooklyn_and_throughout_new_york_city.pdf

[3] Oversight - Taking Stock: A Look into the Third Party Transfer Program in Modern Day New York, N.Y.C. Council, Comm. on Hous. and Bldg, Comm. on Oversight and Investigations, Briefing Paper at 3, 9, 12, and 14 (2019).

York since November 20, 1986, when it acquired title from the City. (R34-38). The building consists of 28 residential units, occupied by proprietary tenants and their families of Latinx and moderate/low income background who met the statutory income requirements of the HDFC program[5], and four commercial units. (R19). Appellant owed arrears in water and sewer charges. (R21). On May 5, 2015, Appellant's managing agent at the time entered into two payment agreements with New York City Department of Environmental Protection (DEP) to pay the outstanding water and sewer charges. (R21).

Unbeknownst to Appellant, its managing agent or shareholders, on July 7, 2015, a few months after entering into the first payment agreement with Appellant, the City invoked Local Law No. 37, and commenced the underlying summary *in rem* foreclosure action. (R60-263). Later, while Appellant was still making payments to the City pursuant to its payment agreements, the City secured a default judgment, extinguished all of Appellant's and its shareholders' ownership and equity interest in the subject building, and then transferred title to the property to Third-Party-Respondent, Neighborhood Restore Housing Development Fund Corporation ("Neighborhood Restore"). (R409).

---

[4] NYC Council, Hr'g of Comm. On Hous. and Bldg., Comm. on Oversight and Investigations, (July 22, 2019) Hr'g Tr. at 10 (statement of Member Ritchie Torres), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3968975&GUID=17B2

[5] https://www1.nyc.gov/assets/hpd/downloads/pdfs/services/hdfc-coop-fact-sheet.pdf

Appellant's shareholders became aware of the foregoing only after agents and/or employees of Neighborhood Restore knocked on their apartment doors, informed them that Neighborhood Restore was the new landlord, and sought to change the locks to the building's entrance door. (R26). Immediately thereafter, Appellant moved by Emergency Order to Show Cause, seeking to, *inter alia*, vacate the default judgment of foreclosure; vacate the transfer of title to Neighborhood Restore; and permit it to file an answer and satisfy outstanding water and sewer charges in arrears and other charges, including property taxes assessed against the property. (R16-17).

This appeal is from the decision and order of the Supreme Court, Bronx, County, entered on May 31, 2019 (Barbato, J), ("Order"), denying Appellant's Order to Show Cause. (R3). The Order misapprehended the law and the facts, and wrongly concluded that Appellant "failed to set forth any valid defenses to the *in rem* foreclosure action," limiting such defenses to "namely, payment and/or exemption from its delinquent real property taxes." (R14).

In fact, Appellant had established that the City failed to follow many of its own requisite and mandatory statutory procedures in the preparation, filing and notice in the underlying action, and therefore improperly denied Appellant basic due process protections. (R491-498).

In addition, Appellant maintained that the City engaged in misleading conduct when its DEP entered into the agreements with Appellant to pay the arrears in water and sewer charges - the first, two months before the underlying proceeding was commenced, and the second, six months before it conveyed title to the subject property to Neighborhood Restore - and failed at these two critical points of time to inform Appellant that it would not honor these agreements, when such information or knowledge would have made a pivotal difference to Appellant's efforts to save its property from foreclosure. (R499-502). Appellant also established that the subject property did not meet the statutory definition of a "distressed property" and therefore was not properly subject to the City's TPT Program. (R478-480).

While the case was *sub judice*, Supreme Court, Kings County (Partnow, J.) in related case, *In Rem Tax Foreclosure Action No. 53 Borough of Brooklyn, 63 Misc.3d 1207(A), 2019 WL 1431423, at *9 (N.Y. Sup. Ct. Mar. 28, 2019),* issued a decision. (R578-646). Presented with evidence of the City's misconduct, identical to what it did to Appellant, Justice Partnow held that the City's conduct was "unconscionable and shocking to the conscience of the court", and found that it implicated equal protection concerns.

Justice Partnow found in pertinent part as follows:

> Moreover the inclusion of a property which is not distressed in an in rem foreclosure action that is subject to the Third Party Transfer Program based upon the mere fact that it is on the same block as another property unrelated to it is completely arbitrary and could not possibly have been the intent of the Administrative Code § 11-405(a), considering the dire ramifications of loss of the property without any recovery of surplus monies as would be obtained in a tax lien sale. Furthermore, it would result in disparate treatment for property owners based upon what block they lived without regard to whether or not their own property was distressed. Such unequal treatment raises equal protection concerns (*see*, US Const 14th Amend, § 1 [providing that "(n)o State shall make or enforce any law shall ... deny to any person within its jurisdiction the equal protection of the laws"); NY Const, art 1, § 11 [providing that "(n)o person shall be denied the equal protection of the laws of this state or any subdivision thereof"]. (*see*, US Const 14th Amend, § 1 [providing that "(n)o State shall make or enforce any law shall ... deny to any person within its jurisdiction the equal protection of the laws"); NY Const, art 1, § 11 [providing that "(n)o person shall be denied the equal protection of the laws of this state or any subdivision thereof"].

*In Rem Tax Foreclosure Action No. 53 Borough of Brooklyn*, at 63 Misc.3d 1207(A).

Lumping Appellant's property in the same grouping as other "distressed" properties on the same block without regard to or consideration as to whether Appellant's property was "distressed" is exactly what the City did here.

The decision *In Rem Tax Foreclosure Action No. 53 Borough of Brooklyn*

was transmitted to Supreme Court. (R575-646). Rather than confront the decision, and address the City's acts found to have been "unconscionable and shocking to the conscience" and to have raised "equal protection concerns", the Order instead merely observed that "The court notes that the subsequently submitted decision, *In Rem Foreclosure Action No. 53*, Sup Ct., Kings County, March 28, 2010, Partnow, J., index number 9700/15, is of a concurrent jurisdiction and is not binding on this court." (R6).

Supreme Court, however, thought it was compelled to reach the result it reached not because of the statute's text or its legislative history, but because it adopted a contrived argument raised by the City in its sur-reply. Initially, the City in opposition contended that the property was a distressed property and therefore properly included in this action. (R463). When in reply, Appellant established that its property was not by any stretch of the imagination "distressed", and therefore should not have been included in this action, the City abandoned this argument, and raised for the first time in sur-reply that Admin. Code § 11-405(a) requires that once the City finds one distressed property on a tax block, it is required to include all delinquent properties on that block, irrespective of whether or not they are distressed. (R557-559).

Admin. Code § 11-405(a) provides in pertinent part as follows:

> The commissioner of finance from time to time shall prepare a list, to be known as a "list of delinquent taxes", of all parcels, or all parcels within a particular class or classes, that are within a particular borough or section of a tax map or portion of a section of a tax map of the city and on which there are tax liens subject to foreclosure pursuant to this chapter, provided, however, that no such portion shall be smaller than a block, as defined in subdivision d of section 11-204 of subchapter one of chapter two of this title. [Emphasis supplied].

Supreme Court and the City disregarded the plain meaning of Admin. Code § 11-405(a), which limits the power of the Commissioner to include properties in this list to parcels "on which there are tax liens subject to foreclosure pursuant to this chapter." Clearly, the tax liens that are subject to foreclosure pursuant to chapter 4 of the Code are tax liens on parcels that are designated as a "distressed property".

To affirm the Order here would sanction a plainly wrong interpretation of Local Law No. 37; and *ultra vires* activity by the City outside of the authority granted to it by the City Council in establishing the TPT Program. Further, it would also, as Justice Partnow observed *In Rem Tax Foreclosure Action No. 53 Borough of Brooklyn* Court, "result in disparate treatment for property owners based upon what block they lived without regard to whether or not their own property was distressed" and thus would violate the due process, and equal

protection provisions of law. The Order should be reversed.

## QUESTIONS PRESENTED

1. Did Supreme Court err in concluding that Appellant's property does not have to meet the statutory definition of a "distressed property" in order for the City to foreclose on Appellant's property under the Third Party Transfer Program, even though Admin. Code § 11-401.1(a), (c), which authorizes the City to do so, respectively mandates the City to make such a determination, and says that "[A]ny parcel so determined to be distressed property shall be subject to an in rem foreclosure action"?

2. Did the City follow the minimal due process procedures required by law before foreclosing on and taking Appellant's property?

## STATEMENT OF THE CASE

### A. Background

In the 1970's, New York City experienced a twin crisis of a substantial housing abandonment and increasing tax delinquency. Both national and local economic trends made it difficult for property owners to meet their tax and other obligations to the City. Moreover, owners of large residential buildings in certain communities abandoned their buildings, after falling behind on their tax and other obligations to the City, and after neglecting property maintenance and health and

safety issues at the buildings, leaving behind tenants at risk.[6]

To address the needs of both tax collection and housing preservation, the City Council enacted Local Law 45 in 1976, which authorized *in rem* foreclosures on properties with tax liens. In the following years, the City proceeded to acquire thousands of properties through this process. By the early 1990's, New York City Department of Housing Preservation and Development (HPD) had become the City's largest landlord, consuming substantial resources.[7] A study of the cost of its residential in rem ownership and management commissioned by HPD revealed that a typical building that had been seized for $36,000 or unpaid taxes cost the City $2.2 million to own, maintain, and prepare for sale.[8] The study also revealed that the buildings remained in City ownership on average for 19 years before moving into private ownership. In addition, tax collections on both residential and commercial buildings were not being adequately pursued and as result real estate tax collection was in decline. Between 1993 and 1996, the City was collecting only 91.17% of the real estate taxes.

---

[6] See, https://comptroller.nyc.gov/wp-content/uploads/documents/NYC_TaxLienReport_v8.pdf
[7] Jerilyn Perine, Harold Shultz, and Stephanie Marazzi, "The Invisible Transformation: Turning Debt Into Revenue", Citizens Housing & Planning Council.
[8] Andersen Consulting, "Breaking the Cycle: Developing an Effective Intervention Strategy for Dealing with New York City's In Rem Housing Problem" (Study Report, unpublished Andersen Consulting, 1994).

In 1996, in an attempt to stem the rising costs associated with ownership of buildings acquired through *in rem* foreclosure proceedings, and to address declining tax collection, the City Council enacted a pair of complementary legislation: Local Law 26, enabling the City to capture tax revenue immediately by bundling, and selling certain tax liens to a private investment trust, which would then retain a servicer to effectuate collections; and Local Law 37, or the Third Party Program, allowing the City to exclude from the tax lien sale certain properties deemed "distressed"; these properties would then be subject to a modified in rem foreclosure process. It is identified as "modified" because the law envisioned the foreclosure process would no longer result in the City taking title. Instead title would be transferred to a new owner, a third party.

**B. The Statutory Scheme at Issue**

1. <u>The Requirement that Properties Meet Definition of Distressed to Be Subject to "Modified" In Rem Foreclosure</u>

Under Local Law No. 37, at NYC Admin. Code 11-401 (4) "Distressed property" is defined as:

> Any parcel of class one or class two real property that is subject to a tax lien or liens with a lien or liens to value ratio, as determined by the commissioner of finance, equal to or greater than fifteen percent and that meets one of the following two criteria:
>
> i. such parcel has an average of five or more hazardous or

> immediately hazardous violations of record of the housing maintenance code per dwelling unit; or
>
> ii. such parcel is subject to a lien or liens for any expenses incurred by the department of housing preservation and development for the repair or the elimination of any dangerous or unlawful conditions therein, pursuant to section 27-2144 of this code, in an amount equal to or greater than one thousand dollars.

See NYC Administrative Code § 11-401.4, et seq.

The legislative intent of Local Law 37 pursuant to which the Program was adopted was set forth in the testimonies of HPD Commissioner Deborah C. Wright and Commissioner Lilliam Barrios-Paoli before the Housing & Buildings Committee of the New York City Council on January 29, 1996, and April 22, 1996, (R518-533), both of which make clear that one of "most critical" parts of Local Law 37 was to target distressed properties "for effective intervention against abandonment." (R521, 529).

Section 11-401.1 (a), (b), and (c) set forth the procedures to determine which parcels are subject to a tax lien sale, or excluded from such sale, and therefore subject to in rem foreclosure.

Pursuant to Section 11-401.1(a), HPD is tasked with the duty to determine whether a property is "distressed" and to exclude from the tax lien sale any parcel deemed "distressed". It provides in pertinent part as follows:

> The commissioner of housing preservation and development shall determine, and direct the commissioner of finance, not less than ten days preceding the date of the sale of a tax lien or tax liens, whether any such parcel is a distressed property as defined in subdivision four of section 11-401 of this chapter. Any tax lien on a parcel so determined to be a distressed property shall not be included in such sale.

Pursuant to Section 11-401.1(c), properties deemed distressed are subject to in rem foreclosure. Section 11-401(c) provides as follows:

> Any parcel so determined to be a distressed property shall be subject to an in rem foreclosure action, or in the case where the commissioner of finance does not commence such action the commissioner of housing preservation and development shall evaluate such parcel and take such action as he or she deems appropriate under the programs, existing at the time of such evaluation, that are designed to encourage the rehabilitation and preservation of existing housing, and shall monitor or cause to be monitored the status of the property. The commissioner of housing preservation and development, in his or her discretion, shall cause an inspection to be conducted on any parcel so determined to be a distressed property. In addition, the commissioner of housing preservation and development shall submit to the council a list of all parcels so determined to be a distressed property within thirty days from the date such parcels are identified as a distressed property.

The obligation for HPD to assess whether a property is distressed is a continuing one. A property initially deemed distressed, and included in list of properties subject to in rem foreclosure is required to be excluded from foreclosure

once it no longer meets the statutory definition of distressed. Section 11-401(b) provides:

> The commissioner of housing preservation and development may periodically review whether a parcel of class one or class two real property that is subject to subdivision c of this section or subdivision j of section 11-412.1[9] of this chapter remains a distressed property. If the commissioner determines that the parcel is not a distressed property as defined in subdivision four of section 11-401 of this chapter, then the parcel shall not be subject to such subdivisions.

2. <u>The Classification of Liens Subject to Foreclosure</u>

Not all arrears in the payment of taxes constitute liens subject to foreclosure under Local Law No. 37. Admin. Code § 11-404(b) addresses the classification of such liens. In the case of HDFC cooperatives, such as the subject building, the tax lien must have been due and remained unpaid for a period of three years. It provides:

> A tax lien on any class one property or any class two property that is a residential condominium or residential cooperative, as such classes of property are defined in subdivision one of section eighteen hundred two of the real property tax law, and on any multiple dwelling owned by a company organized pursuant to article XI of the private housing finance law[10] with the consent and approval of the department of housing preservation and

[9] Subdivision j of §11-412.1 permits the Department of Finance to direct the Corporation Counsel to discontinue an in rem disclosure action even where the property remains distressed. It also requires HPD to maintain a registry of distressed properties.

[10] Including an HDFC Cooperative, such as Appellant in the instant matter.

> development, shall not be foreclosed in the manner provided in this chapter until such tax lien has been due and unpaid for a period of at least three years from the date on which the tax, assessment or other legal charge represented thereby became a lien.

3. The Mandatory Statutory Notice Requirements

The Administrative Code sets forth the mechanism for notifying interested parties that an *in rem* foreclosure action has been commenced. First, to initiate an in rem action, the City must file duplicate lists of delinquent taxes in the office of the clerk of the clerk of the county in which the parcels are located ["List"]. Admin. Code § 11-405. "Forthwith" thereafter, the City must cause a notice of foreclosure to be published at least once a week for six successive weeks in the City Record, and two newspapers, one of which may be a law journal, which are published in and are circulated throughout the relevant county ["Notice of Foreclosure"]. Admin. Code § 11-406(a). In addition, the Notice of Foreclosure must state that the List will be posted and available for inspection at the city collector's central office in the relevant county, the borough office of the city collector "until a specified date at least ten weeks after the date of first publication." Admin. Code § 11-406(b). The Notice of Foreclosure must also be posted "in the office of the commissioner of finance, in the relevant county courthouse, and "at three other conspicuous places" in the relevant borough.

### C. The City Failed To Comply with the Statutory Requirements

1. <u>The Subject Building Was Not "Distressed"</u>

The subject building contains 26 units, and at the relevant period of time had a total of 46 violations of record, but only 33 hazardous (26 "B" Class) and immediately hazardous violations (7 "C" Class"). (R480, 509-517). In other words, the subject building contained an average 1.2 "hazardous" violations per dwelling unit, far below the Administrative Code threshold of a "distressed property": that is, an average of five or more hazardous or immediately hazardous violations of record of the housing maintenance code per dwelling unit. The List filed in the instant action does not include any lien or liens for any expenses incurred by HPD. (R171). Accordingly, the subject building did not meet the statutory definition of "distressed property".

2. The Subject Property Did not Meet the Triggering <u>Tax Lien/Value Ratio</u>

At the time the City prepared and filed the List with the Court, the subject property's market value, with 28 residential units, exceeded a million dollars. The City represented that $399,345.35 was assessed in municipal arrears for taxes, water and sewer charges assessed against the subject property and therefore that the property was properly included in the List. (R171). (See also Order at R7).

However, this was highly scandalous and unduly prejudicial claim, and ultimately wrong. In fact, the List (R171) prepared on June 23, 2015, demonstrated that: only $14,392.62 of DOF Lien constituted a "tax lien"; as it purportedly covered the period ending on December 31, 2011. All the other DOF lien amounts had not yet aged to lien status under Admin. Code § 11-404(b) by the time the List was prepared on June 23, 2015. (R171), and therefore should not have been included.

Additionally, the List included an amount of $270,677.78 listed as "Water Board Lien". (R171). However, no date was specified by the City in the List, or, on information and belief, otherwise in its papers as to when the purported water board lien was assessed against the subject property. (R171).

Thus, at most, the "tax lien" subject to foreclosure was $14,392.62, and such tax lien to value ratio was less than fifteen percent.

3. The City Failed to Comply with the Filing, Posting and Publication Requirements

The City failed to comply with the mandatory filing, posting, and publication requirements of the Admin. Code. It failed to cause the Notice to be published "forthwith". It filed the List with the Office of the Clerk on July 7, 2015, but did not cause the Notice to be published until weeks later, on July 21, 2015. (R482).

The City did not publish the Notice in any newspaper, "published in and circulated throughout" the Bronx, and instead did so in the City Record, New York Journal, and the New York Post. (R485).

The Notice itself is facially defective and contrary to the mandates of the Admin. Code in that it failed to accurately describe where the List would be posted for inspection and the duration of time. (R485-487).

The City also failed to comply with the actual posting requirements of Admin. Code. The Admin. Code requires the Notice to be posted in five (5) different locations in the Bronx. In contrast, the City admitted that it only posted the Notice two times in offices located at the same address: 3030 Third Avenue, 2nd Floor, Bronx, New York 10457 (the Bronx Business Center of the New York City Department of Finance and the Bronx Office of the New York City Register). (R302).

The City also stated that it posted the public interviewer area at the Bronx borough office of the New York City Department of Housing Preservation and Development, 1932 Arthur Avenue, 3rd Floor, Bronx, New York 10457; and in the main office of the Commissioner of the Department of Finance, 1 Centre Street, 5th Floor, New York, New York 10007. (R303). Neither satisfies the posting requirement of NYC Admin. Code § 11-406 (d). The public interviewer area at the

Bronx borough office of the New York City Department of Housing Preservation and Development, 1932 Arthur Avenue, 3rd Floor, Bronx, New York 10457 is not a "conspicuous[11]" place as it houses HPD's Division of Code Enforcement where interested persons seek, *inter alia*, "information about housing code violations existing at your property and guidance on how to address them", issues not relevant in this matter.

Lastly, two of the postings were allegedly done after July 21, 2015, therefore not providing persons who may have inspected the postings the requisite "at least ten weeks" period. According to the City's own Affidavits of Posting, the posting in the New York State Supreme Court, Bronx County did not take place until July 23, 2015; and the posting on the "bulletin board directly outside the office of the Commissioner of the Department of Finance" did not take place until August 10, 2015. (R490, 542-544).

**D. The City Failed to Serve Appellant with the Notice of Foreclosure; and Could Not Produce Competent Evidence that it did**

Appellant's Managing Agent, officers, and shareholders unequivocally denied having received a Notice of Foreclosure, or any document notifying the affected persons that the City had commenced a foreclosure proceeding against the

[11] Admin. Code § 11-406(d) says: "The commissioner of finance shall cause a copy of such notice to be posted in the office of the commissioner of finance, in the county courthouse of the county in which the property subject to such tax lien is situated and at three other conspicuous

subject premises, and their ownership rights were in grave jeopardy. (R18-24; 25-28; 29-30).

In fact, the City's allegations regarding service were highly suspect. The City alleged that it mailed one of the Notices on July 14, 2015, and that this package was delivered on July 16, 2015. (R41). Yet, the Notice was dated July 17, 2015 (R39); three days after it was supposedly mailed on July 14. Despite being afforded numerous opportunities to present competent evidence that it properly served 1600 Nelson with the Notice, the City failed to do so.

### E. The City Entered into Two Installments Agreement with Appellant

On May 8, 2015, two months before the City commenced the underlying in rem action, 1600 Nelson entered into an agreement with the City for the payment of arrears in water and sewer charges, and consistently paid the City in accordance with the Agreement until January 2018, when 1600 Nelson faced emergency repairs to its heating system and temporarily suspended payments to the City. (R21-22, 54-57).

The City did not, and could not, contest the existence of this agreement; nor that Appellant made the requisite payments; nor that the City accepted same. The City also never denied that it failed to notify Appellant that this agreement was not

---

places in the borough in which the affected properties are located."

valid anymore, and would not save Appellant from the loss of its property. In light of this agreement, Appellant's property should not even have been included in the List subject to the instant proceeding since at the very least the List did not properly credit Appellant for payments it made. Moreover, the failure of the City to notify Appellant that the City had reversed its position and had rebuked the agreement constitutes a denial of due process.

In March 2018, four months after the City secured a default judgment of foreclosure against Appellant, but six months before it conveyed the subject property to Neighborhood Restore, Appellant's Managing Agent personally went to DEP, and made another arrangement to resume the payment of the water and sewer charges. (R22, 264-269). Appellant made a number of payments in accordance with this arrangement through September 2018. (R23).

By entering into these agreements and accepting payments from Appellant pursuant to these agreements, the City deluded Appellant into the reasonable conclusion that the water and sewer issue had been resolved and there was no further threat to its ownership of the property. Had the City informed Appellant that it would initiate a foreclosure proceeding despite the May 9, 2015 agreement, or had the City informed Appellant in March 2018, when the Managing Agent met with the DEP representative, that it had secured a default judgment and intended to

soon transfer title to the subject premises to Neighborhood Restore, Appellant would have taken the necessary steps to seek appropriate relief, including seeking to vacate the default judgment, stay the transfer, to seek relief under Admin. Code § 11-412.1(d), and/or pay all the tax liens due.

### F. The Default Judgment and Transfer of the Deed

By Judgement of Foreclosure, dated November 16, 2017, and entered on December 1, 2017, the Court granted the City a final judgment, and authorized the City to prepare and execute a deed conveying title to either to the City or to a qualified third party.

Under Admin. Code § 11-412.1, the City may convey title to affected properties. Admin. Code § 11-412.1 (c) specifies the type of full and complete title which the Commissioner of Finance shall convey to the third party providing that upon the execution of the deed, the "city or the third party shall be seized of an estate in fee simple absolute in such land..."

In accordance with the provisions of Admin. Code § 11-412.1 (c), the December 1, 2017 default judgment provides as follows:

> ".. that upon the execution of said deed or deeds to the City or to a third party ..., the grantee shall ... be seized of an estate in fee simple absolute ... [emphasis supplied]. [Cite]

However, the estate conveyed to Neighborhood Restore was less than fee simple. The relevant portions of the Third Party Transfer Agreement, demonstrating that the estate conveyed to Neighborhood restore was not fee simple absolute but instead contained various conditions:

> 1. Owner shall not, without the prior written consent of HPD, cause or permit any total or partial transfer, sale, disposition, transfer, assignment or conveyance of any interest in the Premises, or any part thereof, at any time prior to the third anniversary of the Closing Date, except as permitted under Paragraph 2 and Paragraph 3 below.
>
> 2. HPD shall have the right to direct Owner to deliver a deed conveying full and complete title to the Premises or a portion thereof to a person or entity designated by the City at any time prior to the third anniversary of the Closing Date. HPD shall exercise such right by notice to Owner indicating (i) the name and address of the such person or entity designated by the City, (ii) the date by which such transfer of title shall occur, which date shall not be less than thirty (30) days after the date of delivery of such notice, and (iii) and such other information as HPD shall determine.
>
> 3. Owner shall have the right to deliver a deed conveying full and complete title to the Premises or a portion thereof, free of all liens and encumbrances other than municipal liens and encumbrances, to the City or its designee (the "Right of Conveyance") for a period (the Conveyance Period") terminating on the second anniversary of the Closing Date and commencing on

> the earlier of (i) the first anniversary of the Closing Date, or (ii) the date that HPD stops providing funding to Owner at the levels set forth in the budget previously agreed to by HPD and Owner for the property to be conveyed.

### G. TPT Program has Targeted Properties in Certain Neighborhoods.

The City's careless application of the TPT Program would be reason enough to require reversal of the Order. But coupled with evidence that the City's careless application has been unconscionable targeted to certain neighborhoods, the Order is simply indefensible. The Report issued by the City Council, Committee on Oversight and Investigations and Committee on Housing and Buildings confirms a litany of fatal defects with Round X of the TPT Program.[12] Among other things, it found that 50% of the properties selected for inclusion were not statutorily distressed in that they had a tax lien to value ratio of only 3%, far below the 15% statutory threshold of distressed.[13] Moreover, 155 of these 210 properties did not have five or more B or C violations per dwelling unit.

Significantly, the City Council Report also found that the City's careless application of the TPT Program was directed to mainly already vulnerable communities of color. The Report confirmed that 118 out of the 420 properties

[12] Oversight - Taking Stock: A Look into the Third Party Transfer Program in Modern Day New York, N.Y.C. Council, Comm. on Hous. and Bldg., Comm. on Oversight and Investigations, Briefing Paper (2019).

[13] Id at page 9.

selected for Round X, and 27 of the 65 properties that were foreclosed and transferred, nearly 42%, were, like Appellant, HDFC cooperatives. Ironically, the City created HDFC cooperatives as a way to sell City-owned multifamily buildings to the tenants of those buildings and provide home ownership opportunities to lower income New Yorkers. Residents of those buildings, concentrated in communities of color, in the Lower East Side, Upper Manhattan, Brooklyn, and the South Bronx, were able to purchase shares in the stock of their buildings at a reduced price in exchange for relieving the City of the costs of taking care of their building, often dilapidated and in a state of disrepair. In effect, in the guise of creating new affordable housing, the City was eliminating already existing affordable housing.[14] This was a duplicitous display of smoke and mirrors. The practical effect of the TPT Program foreclosures was that the HDFC cooperative lost its cooperative status and reverted to rental building post-transfer. This means that already economically vulnerable New Yorkers who had attained the American Dream of home ownership - and may have spent years rehabilitating and maintaining such properties when the City no longer wished to do so - stood to lose ownership of their homes as a result of TPT. Indeed, the populations of the 11 neighborhoods targeted by the TPT Program range from 57 percent Black and

[14] Siegel Teitelbaum & Evans, LLP, "Broken Promise: New York City's Tenant Interim Lease"

Latinx (Bedford-Stuyvesant, Brooklyn)[15] to 96 percent Black and Latinx (University Heights-Morris Heights, Bronx), where the subject property is located.[16]

### H. Supreme Court's Decision

By Order entered on July 9, 2019, the Court (Barbato, J.) denied Appellant's Order to Show Cause to vacate the default judgment of foreclosure and sale. (R5-15). It found the clear statutory language and consistent legislative history limiting the TPT Program's reach to "distressed" properties insufficient to require the City to exclude the subject property from foreclosure. (R8). Disregarding the definition of "tax liens subject to foreclosure" under Admin. Code § 11-404(b), it further found that Appellant's property was properly included in the foreclosure action because it had "tax lien for its unpaid real property taxes" as of June 2015 (R9), despite the fact that a mere perusal of the List would have revealed that most of the unpaid real property taxes had not "aged" to tax lien status, and some were not even yet due! (R171).

---

Program and Those Left Behind (February 11, 2017) at http://stellp.com/TIL%20report.pdf.

[15] Demographic Profile of University Heights, NYC Dept. of City Planning, Population, Fact Finder, https://popfactfinder.planning.nyc.gov./profile/756/demographic (last visited November 29, 2020.

[16] Demographic Profile of University Heights, NYC Dept. of City Planning, Population, Fact Finder, https://popfactfinder.planning.nyc.gov./profile/1058/demographic (last visited November 29, 2020

It held that Appellant's agreement with the City to pay the arrears in water and sewer could not have led Appellant to change its position to its detriment because Appellant also owed real property taxes. (R9). But as previously demonstrated, most of those taxes had not yet aged to "tax lien status" and payment on some were not even yet due.

The Court found that the estate conveyed to Neighborhood Restore was fee simple, although at the same time the Property was conveyed to Neighborhood Restore, there was an Agreement with several conditions clearly rendering Neighborhood Restore's title not fee simple absolute. But rather than address the agreement, and its effect on title, the Court rather resorted to a superficial, and unpersuasive reading of the deed. (R12-13).

Lastly, the Court found that Appellant's motion to vacate the default judgment was "untimely" because it was made four months after entry of an in rem judgment of foreclosure, citing Admin. Code § 11-412.1(h). (R14). The Court then stated that Appellant's "denial of receipt of notice of" the foreclosure notices is insufficient to overcome the conclusive presumption of regularity, seemingly suggesting that Appellant had merely alleged non-receipt of the notices. In fact, Appellant had demonstrated that the City failed to comply with statutory requirements, and failed to comply with the mandatory filing, posting, and

publication requirements of the Admin. Code; essential prerequisites to satisfy minimal due process requirements.

## ARGUMENT

## POINT I

## SUPREME COURT ERRED IN DETERMINING THAT THE CITY PROPERLY AVAILED ITSELF OF THE IN REM FORECLOSURE PROCEEDINGS AGAINST THE SUBJECT PROPERTY

Summary in rem foreclosures proceedings under Chapter 4 against HDFC buildings such as the Subject Building are available only for tax or tax liens that became due or remain unpaid for a period of at least three years from the date on which the tax, assessment or other legal charge became a lien.

Admin. Code § 11-404(b), entitled "Foreclosure by action in rem", specifically states:

> b. A tax lien on any class one property or any class two property that is a residential condominium or residential cooperative, as such classes of property are defined in subdivision one of section eighteen hundred two of the real property tax law, and on any multiple dwelling owned by a company organized pursuant to article XI of the private housing finance law with the consent and approval of the department of housing preservation and development, shall not be foreclosed in the manner provided in this chapter until such tax lien has been due and unpaid for a period of at least three years from the date on which the tax, assessment or other legal charge represented thereby became a lien.

A tax lien for Chapter 4 foreclosure and other purposes is defined in the definitions section thereof Admin. Code § 11-401.1, to wit:

> "Tax lien." The lien arising as a result of the nonpayment of taxes, assessments, sewer surcharges, water rents, any other charges that are made a lien subject to the provisions of this chapter or chapter three of this title, interest and penalties thereon, and the right of the city to receive such amounts."

In addition, commencement of Chapter 4 proceedings are governed by the procedures specified in Admin. Code § 11-405 (a), (b) and (d), which provide:

> a. The commissioner of finance from time to time shall prepare a list, to be known as a "list of delinquent taxes", of all parcels, or all parcels within a particular class or classes, that are within a particular borough or section of a tax map or portion of a section of a tax map of the city and on which there are tax liens subject to foreclosure pursuant to this chapter, provided, however, that no such portion shall be smaller than a block, as defined in subdivision d of section 11-204 of subchapter one of chapter two of this title. Every such list shall bear a caption containing the in rem action number of the city's tax foreclosure proceeding, the borough or the section of a tax map or portion of a section of a tax map, and where the action covers less than all parcels in an entire borough or section of a tax map or portion of a section of a tax map, the particular class or classes, and shall contain a statement of the rate or rates at which interest and penalties will be computed for the various liens it includes.
>
> b. Every such list shall set forth the parcels it includes separately and number them serially. For each parcel it

> shall contain (1) a brief description sufficient to identify the parcel, including section, block and lot numbers, and the street and street number, if any, or in the absence of such information the parcel or tract identification number shown on a tax map or on a map filed in the county clerk's or register's office and (2) a statement of the amounts and dates of all unpaid tax liens which are subject to foreclosure under this chapter and of those which have accrued thereafter.

* * *

> d. Two duplicate originals thereof, verified by the commissioner of finance or a subordinate designated by the commissioner, shall be filed in the office of the clerk of the county in which the parcels listed therein are situated. Such filing shall constitute and have the same force and effect as the filing and recording in such office of an individual and separate notice of pendency of action and as the filing in the supreme court in such county of an individual and separate complaint by the city as to each parcel described in said list, to enforce the payment of the delinquent taxes, assessments or other lawful charges which have accumulated and become liens against such parcels.

Accordingly, to avail itself of Chapter 4 in rem proceedings against any property, the City must comply with, and harmonize all the relevant provision of Admin. Code, including Admin. Code §§ 11-404(a), 11-401.1, 11-405(a) and (d), and 11-401(4).

Pursuant to Admin. Code § 11-401.1, a charge does not become a "tax lien" until the date on which it was due for payment has passed or expired ("the

lien arising as a result of the nonpayment of taxes, assessments … and other charges that are made a lien subject to the provisions of [chapter 4] or [chapter e]"). Admin. Code § 11-404(a) makes a charge a lien under Chapter 4. Admin. Code § 11-301 makes a charge a lien under Chapter 3. Pursuant to Admin. Code § 11-404(b), a foreclosure by in rem on the basis of a section 11-401.1 tax lien is not available to the City until "such tax lien has been due and unpaid for a period of at least three years from the date on which the tax, assessment or other legal charge represented thereby became a lien." Pursuant to Admin. Code § 11-405(a), the list of delinquent taxes on which in rem proceedings are commenced under Chapter 4 are specifically for parcels of property "on which there are tax liens subject to foreclosure pursuant to [Chapter 4]."

As such, a significant amount of the municipal charges included in List (and in particular those with due dates after 6/23/2012) were in fact not tax liens under Admin. Code § 11-404(a). (R171). Accordingly, the amounts in the List marked as due on 7/01/2012, 10/1/2012, 01/01/2013, 04/01/2013, 07/01/2013, 10/01/2013, 01/01/2014, 04/01/2014, 07/01/2014, 10/01/2014, 01/01/2015, 04/01/2015, and 07/01/2015, for example did not give the City a right under Chapter 4 to commence in rem foreclosure proceedings against the Subject Property on June 23, 2015 when the List was prepared (these amounts had not aged to "tax lien status"

for foreclosure under Admin. Code § 11-404[a]). Arguably, even the amounts listed as due on earlier dates in 2011 and in 2012 may not have aged to tax lien status under Chapter 4 (see Admin. Code § 11-401.1).

There is no indication of the due date for the water board lien ($270,777.78). (R 171). This is direct violation of Admin. Code § 11-405, which requires a "statement of the amounts and dates of all unpaid tax liens which are subject to foreclosure under this chapter". Thus the water board lien, as well as all the post 6/23/2012 property liens were mere putative liens, not yet ripened to "tax lien" status.

The City's assertion that these putative lien amounts were proper to commence the underlying in rem foreclosure action under Admin. Code § 11-404(b) and then secure the default foreclosure judgment under Admin. Code § 11-412(b) was simply unlawful, and the Court erred in relying on the City's misrepresentation.

Further, Supreme Court's reliance on Admin. Code § 11-405(a) to conclude that although the Subject Property "did not itself meet the statutory definition of 'distressed'" it could still be subject to Chapter 4 foreclosure so long as another property in the same tax class on the same tax block was selected for inclusion, is flawed. Admin. Code § 11-§405(a) says no such thing. Even read in insolation,

Admin. Code § 11-§405(a) does not provide for such a sweeping reading. In fact, the Court adopted an argument made by the City in its sur-reply, where it argued that while Admin Code § 11-401.1(c) provides distressed properties are subject to foreclosure as opposed to a tax lien, "nowhere does section 11-401.1(c) provide that 'only' distressed properties may be foreclosed in rem." (R557-559).

In essence, the City had conceded that the statute does not specifically and expressly authorized it to include properties that do not meet the distressed designation, but nonetheless contended that the statute did not prohibit it from doing so, therefore it could do so. *Id*. This argument constitutes a blatant abuse of government power: We can do it especially against vulnerable New Yorkers because nowhere does it say we cannot.

Supreme Court erred in relying on the City's flawed argument. First, the power of the City to foreclose pursuant to an in rem action is a creation of statute. It well established that such tax in rem foreclosure statutes must be strictly construed in favor of the tax payer, and against the tax power. The Court of Appeals in *People ex rel. New York City Omnibus Corp. v. Miller* 282 NY 5, 24 NE2d 722 (1939), has stated: "In our opinion all tax laws are to be strictly construed against the taxing power, cannot be extended by invoking their spirit, and, if open to doubt, must be resolved in favor of the taxpayer."

Second, the City's argument runs afoul of the well established statutory construction maxim *expressio unius est exclusio alterius* - that is, "the specific mention of one person or thing implies the exclusion of other persons or thing." As otherwise expressed, where a law expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted and excluded was intended." N.Y. Constr. & Interp. Law § 240. *Schultz Management v. Board of Standard and Appeals of the City of New York,* 103 AD2d 687, 477 NYS2d 351, aff'd 64 NY2d 1057, 489 NYS2d 902, 479 NE2d 247.

The City should not have been permitted to merely point, as it did in this case, that the statute does not specifically prohibit its action. The City should have been required to point to a specific provision of the statute that empowered and authorized it to subject the Subject Property to foreclosure. The City could not have cited any such provision because of a simple fact: none exists.

Supreme Court's reading of Admin. Code § 11-405(a) to require the City to include the Subject Property in the TPT Program because it found another distressed property on a tax block is unattainable. It would give the City's Commissioner of Finance limitless power. In fact, Admin. Code § 11-405(a) provides in pertinent part as follows:

> The commissioner of finance from time to time shall prepare a list, to be known as a "list of delinquent taxes",

> of all parcels, or all parcels within a particular class or classes, that are within a particular borough or section of a tax map or portion of a section of a tax map of the city and on which there are tax liens subject to foreclosure pursuant to this chapter provided, however, that no such portion shall be smaller than a block, as defined in subdivision d of section 11-204 of subchapter one of chapter two of this title. [Emphasis supplied].

Supreme Court disregarded that the power of the Commissioner to include properties in the List is limited by statute to parcels "on which there are tax liens subject to foreclosure pursuant to this chapter." The tax liens that are subject to foreclosure pursuant to this chapter are tax liens on parcels that are designated as a "distressed property".

Thus, rather than analyzing the statutory interpretation issue in the context of the "overall statutory scheme" as the law requires, Supreme Court focused, in isolation, the provision that the "List" must include "all parcels" that are "within a particular borough or section of a tax map", but ignored the qualifying clause "which there are tax liens subject to foreclosure pursuant to this chapter."

This modifying clause is significant to the overall statutory scheme, and not mere verbiage. As N.Y. Constr. & Interp. Law § 98(a) provides: "The court must give effect to all language employed; a statute must be read so that each word therein will have a meaning and not so that one work or sentence will cancel and

render meaningless another word or sentence."

The Court's finding that one property on the same tax block as the Subject Property - specifically, 71 West 174th Street - met the statutory designation of "distressed property" is also flawed. The City's arguments regarding 71 West 174th Street should have been discarded, not only because they were made in sur-reply, but also because they were all based on hearsay. None of the allegations were based on firsthand knowledge. (R558). Accordingly, they were improper.

**POINT II**

**THE COURT LACKED JURISDICTION TO ENTER IN REM JUDGMENT OF FORECLOSURE AND SALE AGAINST THE SUBJECT PROPERTY**

Supreme Court erred in finding that Appellant's Order to Show cause was untimely and that Admin. Code § 11-412.1(h) prevented Appellant from asserting jurisdictional defects after the entry of the judgment. The requirements of NYC Admin. Code § 11-406 (b) must be strictly complied with. Failure on the part of the City to substantially comply with its mandatory requirements is a jurisdictional defect. A deed acquired from a flawed process, such as in the instant case, is void.

As the Court of Appeals in a similar tax foreclosure case, *Werking v. Amity Estates, Inc.*, 2 NY2d 43, 155 NYS2d 633 (1956) has instructed:

> The word "shall" is one of mandate. Without question, the statute was enacted for the benefit of the taxpayer.

> The Legislature has commanded that the collector provide the requisite notice and in its wisdom, has described the specific procedure with that which the Legislature has deemed necessary. If we were permitted to dispense with one requirement of [the law], we would be able to excuse compliance with the statute in toto.

The Court went on further to note that the failure of the "tax collector to substantially comply with the mandatory requirements of [the law] pertaining to notice is a jurisdictional defect." See also, *Olds v. Jamestown*, *supra* where the Court held in pertinent part that "Failure to give the notice required by law is jurisdictional defect, which cannot be overlooked or remedied by curative statute. Statutes which limit the time for redemption after tax sales are not applicable where the tax sale is void and no title is passed."

All formal requirements governing tax sale proceedings must be scrupulously satisfied, because the result is divestiture of title to real property. *Land v County of Ulster*, 84 NY2d 613, 616, 644 NE2d 1325, 620 NYS2d 769 (1994). Thus, "the failure to substantially comply with the requirement of providing the taxpayer with proper notice constitutes a jurisdictional defect which operates to invalidate the sale or prevent the passage of title". *Matter of Byrnes v County of Saratoga*, 251 AD2d 795, 797, 674 NYS2d 463.

If statutory or code requirements are not satisfied, Courts must vacate

defaults and set aside improperly transferred deeds. Accordingly, the Court *Matter of County of Seneca [Maxim Dev. Group]*, 151 AD3d 1611, 56 NYS3d 704 (3rd Dept., 2017), found that the Petitioner failed to establish that the notice was duly addressed and mailed to respondent; and thereupon held that the judgment of foreclosure should be vacated inasmuch as it was jurisdictionally defective.

Accord: *Matter of Foreclosure of Tax Liens [ExxonMobile Oil Corp - Hughes]*, 41 AD3d 1243, 839 NYS2d 380 (4th Dept, 2007); *Byrnes v. County of Saratoga*, 251 AD2d 795, 674 NYS2d 463 (3rd Dept, 1998); and *Szal v. Pearson*, 289 AD2d 562, 675 NYS2d 200 (2nd Dept., 2001).

**A. The City Failed to Follow the Statutory Mandatory Requirements**

The City failed to publish the Notice of Foreclosure "forthwith" as mandated by the Admin. Code; and to publish said notice in a newspaper which is "published in and circulated" in the Bronx.

NYC Admin. Code § 11-406 (a) provides the commissioner of finance forthwith shall cause a notice of foreclosure to be published at least once a week for six successive weeks in the City Record and, subject to section ninety-one of the judiciary law, in two newspapers, one of which may be a law journal, to be designated by the commissioner of finance, which are published in and are circulated throughout the county in which the affected property is located.

According to the City's Affirmation of Regularity, dated October 18, 2017, the List was filed in the Office of Clerk of Bronx County on July 7, 2015. (R300). Yet, the City did not cause the Notice of Foreclosure to be published until beginning July 21, 2015. (R302).

"The words 'forthwith' and 'immediately' have the same meaning. They are stronger than the expression 'within a reasonable time' and imply prompt, vigorous action, without any delay, and whether there has been such action is a question of fact having regard to the circumstances of the particular case." *People v. Frudenberg*, 209 NY 218, 103 NE 166 (1913); *see also*, *Ayers v. Coughlin*, 72 NY2d 346, 530 NE2d 373, 533 NYS2d 849 (1988) ["...'forthwith' means that it is to be done without delay, at once, promptly. 'Forthwith' signals immediacy."]

The purpose of the publication requirement is to give notice to property owners affected by the City's swift and speedy action. That section was intended for the benefit of affected property owners, and other interested parties, to warn them of the impeding foreclosure action as quickly as possible so that they will take necessary steps to protect their property. It is clear in requiring that the Notice of Foreclosure be published "forthwith" after the List is filed, however, that the City Council intended no such delay. The City cannot have it both ways: It cannot, on the one hand, want to summarily foreclose properties, "fast and swiftly"; but

then, on the other hand, wait 14 days to notify owners and other interested parties that they will risk forfeiting their valuable assets, and, in this case, losing home ownership. In light of the foregoing, the 14-day delay is not "forthwith" and constitutes an unreasonable delay, and the City's failure to cause the Notice of Foreclosure to be published sooner is a fatal jurisdictional defect.

The City not only failed to cause the Notice of Foreclosure to be published "forthwith" as mandated by the law, but it also failed to cause it to be published in the proper publications. NYC Admin. Code § 11-406 (a) requires the Notice of Foreclosure to be published in two "newspapers, one of which may be a law journal, to be designated by the commissioner of finance, which are published in and are circulated throughout the county in which the affected property is located." Only if there are no newspapers published in such county, can the commissioner of finance "designate newspapers published in the city of New York which are circulated throughout the affected county."

The Bronx County Clerk of the Supreme Court publishes a list of newspapers designated by the Appellate Division, First Department, to publish legal notices. It includes a number of weekly newspapers published in and circulated in the Bronx, including the Bronx Free Press, the Bronx News, the Bronx Press Review, and Bronx Times Report. (R485).

In the instant case, by the City's own admission, it failed to follow these publication requirements. According to the City, the Notice of Foreclosure was instead caused to be published in the City Record, the New York Law Journal, and the New York Post, the latter two newspapers are not published in the Bronx, and the New York Post is not even included in the List authorized by the Bronx County Clerk of the Supreme Court, and is most certainly not published in the Bronx. (R534).

Moreover, the Notice of Foreclosure itself was fatally defective and contrary to the clear mandates of NYC Admin. Code § 11-401 et seq. in that it failed to accurately describe where the List would be posted for inspection; and the duration of time the List would remain posted. See, NYC Admin. Code § 11-406(b).

NYC Admin. Code § 11-406(b) mandates the published Notice of Foreclosure to provide that the List must be posted for inspection in two locations: "at the city collector's central office and at the borough office of the city collector in the borough in which said property is located." In the instant action, the published Notice of Foreclosure was inadequate, defective, and contrary to the NYC Admin. Code § 11-406(b) in at least three significant ways. First, whereas NYC Admin. Code § 11-406(b) requires that the List of Delinquent Taxes be posted for inspection in two locations; the Notice of Foreclosure, in contrast,

provided that the List would be posted in only one. Thus, according to the City's opposition, the Notice of Foreclosure, published in the City Record, in the New York Law Journal and in the New York Post, provided instead that "a certified copy of such list of delinquent taxes has been filed in the Bronx Business Center of the City of New York Department of Finance, 3030 Third Avenue, Second Floor, Bronx, NY 10455..." (R539-542).

Second, whereas NYC Admin. Code § 11-406(b) mandates the Notice of Foreclosure to provide that the List will be posted at "the city collector's central office and at the borough office of the city collector in the borough in which said property is located, the published Notice of Foreclosure, however, did not say that the posting will be at "city collector's central office or at the borough office of the city collector", but rather "in the Bronx Business Center".

This discrepancy in the description of the sites or locations where the List will be posted is significant because it creates confusion, and ambiguity, and is therefore jurisdictionally defective and fatal.[17] *See, Wayman v. Zmyewski*, 218 AD2d 843, 629 NYS2d 871 (3rd Dept., 1995) [foreclosure sale set aside because published notice stated sale would be on courthouse 'steps' but sale took place in

[17] The "borough office of the city collector" and the "Bronx Business Center" may well describe the same office. Still, the burden should not be placed on owners and other interested persons and entities, who are already engaged in the Herculean task of navigating the in rem foreclosure process, to figure out the City's Kafkaesque lexicon and monikers.

the courthouse lobby]; see also, *Weil v. Laube*, 235 NYS 14, 134 Misc 454 (Sup. Ct., 1929), aff'd 227 AD 729, 236 NYS 919 (2nd Dept., 1929) [sale vacated where sale was noticed to be held at main entrance of courthouse, but was held instead in rotunda].

Third, whereas NYC Admin. Code § 11-406 (b) requires the Notice of Foreclosure to provide that the posted List will be available for inspection "until a specified date at least ten weeks after the date of first publication" [emphasis supplied], the published Notice, however, specifies the "29th day of September, 2015", which was on or before the expiration of ten weeks after the date of first publication, which according to the City was July 21, 2015.

In *Olds v. Jamestown*, 280 NY 281, 20 NE2d 756 (1939), the Court of Appeals stated that "Notice by publication once a week for six successive weeks is given when six weeks have expired - not before." See also, *Albany v. Goodman*, 203 AD530, 197 NYS 739 (3rd Dept., 1922) [the terms of sale of city real property must be strictly complied with all applicable provisions of the statute; and failure to do so renders a sale invalid and void]; *Stevens v. Breen*, 258 AD 423, 16 NYS2d 909 (2nd Dept., 1940) ["The [lower] Court properly held that defendant's tax title was bad because notice of the tax sale, while it was published once a week for six weeks, was not continued for a period of forty-two days]; and *Welhaven v. Kohn*,

257 AD 744, 15 NYS2d 183 (3rd Dept., 1939) [publication notice not strictly complied, and sale invalidated where notice by publication required once a week for six successive weeks, but sale took place after 38 days of first publication instead of 42 days].

In the instant case, the September 29, 2015 date, specified in the Notice of Foreclosure published, jumped the gun, and did not provide owners of affected properties at least ten weeks after the date of the first publication. Such date did was well before the expiration of the requisite ten-week period.

The City also failed to comply with the actual posting requirements of Admin. Code § 11-401 et seq. Admin. Code § 11-406 (d) provides The commissioner of finance shall cause a copy of such notice to be posted in the office of the commissioner of finance, in the county courthouse of the county in which the property subject to such tax lien is situated and at three other conspicuous places in the borough in which the affected properties are located.

Thus, in the instant case the statute requires the Notice to be posted in five (5) different locations in the Bronx. In contrast, the City admitted that it only posted the Notice twice in offices located at the same address: 3030 Third Avenue, 2nd Floor, Bronx, New York 10457 (the Bronx Business Center of the New York City Department of Finance and the Bronx Office of the New York City Register).

(R303).

The City also stated that it posted the Notice in the public interviewer area at the Bronx borough office of the New York City Department of Housing Preservation and Development, 1932 Arthur Avenue, 3rd Floor, Bronx, New York 10457; and in the main office of the Commissioner of the Department of Finance, 1 Centre Street, 5th Floor, New York, New York 10007. (R303). Neither satisfied the posting requirement of NYC Admin. Code § 11-406 (d). The public interviewer area at the Bronx borough office of the New York City Department of Housing Preservation and Development, 1932 Arthur Avenue, 3rd Floor, Bronx, New York 10457 is not a "conspicuous" place as it houses HPD's Division of Code Enforcement where interested persons seek, inter alia, "information about housing code violations existing at your property and guidance on how to address them", issues not relevant in this matter.

Lastly, two of the postings were allegedly done after July 21, 2015, therefore not providing persons who may have inspected the postings the requisite "<u>at least ten weeks</u>" period. According to the City's own Affidavits of Posting, the posting in the New York State Supreme Court, Bronx County did not take place until July 23, 2015; and the posting on the "bulletin board directly outside the office of the Commissioner of the Department of Finance" did not take place until August 10,

2015. (R302).

## B. The City Did Not Properly Effectuate Service, thus Denying Appellant Due Process

Supreme Court also erred in finding that Appellant had merely denied receipt of the Notice of Foreclosure, and that such denial was insufficient to overcome the conclusive presumption of regularity. Appellant had not merely denied receipt. Appellant demonstrated that the City's own documents were questionable, and the City failed to come forth with evidence establishing that service was proper. Thus, the presumption of regularity was improperly relied on by Supreme Court. Moreover, the presumption is not available in the absence of an affidavit providing evidence of mailing to the person or entity to which the notice is to be given. There must be an affidavit by a person with personal knowledge of the mailing in order for an affidavit to be sufficient in order for the Court to make a factual determination that the mailing was made. *AB Medical Services PPLC v. Specialty National Ins. Co.*, 11 Misc3d 144(A), 810 NYS2d 846 (AT, 2nd and 11th Jud. Dist, 2006). Although proof of mailing may consist of an affidavit describing routine procedure that proof must show that the item mailed was properly addressed. If the routine office practice is careless, it is insufficient to prove that an item was duly mailed as required. In order for the presumption of

proper mailing to arise, office practice must be geared so as to ensure the likelihood that a notice is always properly addressed and mailed.

In *Nassau Inc. Co. v. Murray*, 46 NY2d 828, 414 NYS2d 117 (1978), the Court of Appeals ruled that the presumption applies only when there is proof that the item was properly addressed and mailed, noting in pertinent part that "in order for the presumption to arise, office practice must be geared so as to ensure the likelihood that a notice of cancellation is always properly addressed and mailed."

The documents submitted in support of the December 1, 2017 default judgment contained failed to demonstrate that the Notice of Foreclosure was mailed to Appellant or that the presumption could be applied. The Affirmation of Regularity and the affidavits of mailing describe the general office procedure for mailing Notices of Foreclosure. However, they fail to show that this general office procedure was followed, and if followed would ensure the likelihood that the notices are properly addressed and mailed.

None of these affidavits and the documents annexed to them showed that anyone with personal knowledge checked the names and addresses on the envelopes to make sure that the notices of foreclosure were actually addressed to the owners of the properties involved.

The affidavit of regularity and the affidavits of mailing and bulk mailing

receipts also failed to show the names and addresses of the persons and entities to which the Notice of Foreclosure was sent. The conclusory statements contained in these affidavits did not, and cannot, show to whom and to what addresses the mailings were made. The affidavits referred to computers having generated the names and addresses for mailing. However, they did not show that any live person actually checked the names and addresses of the recipients of the mail against the records contained in the Department of Finance, which records are supposed to contain the names and addresses of the owners or other persons or entities to which tax bills and notices were to be sent.

The necessity for a person to check the names and addresses on the envelopes actually mailed was pointed out by the Court in *Lubermens Mut. Cas. Co. v. Comparato*, 151 AD2d 265, 267, 542 NYS2d 179, 181 (1st Dept., 1989), where the Court ruled as follows:

> Although an officer may testify as to office practice and policy, when reliance is placed on a mailing sheet, proof must include testimony that the employee checks the names and addresses on the envelopes with those on the mailing sheets in the regular course of business.

See also, *Matter of Government Employees Inc. Co*, 112 AD2d 226, 227, 491 NYS2d 442, 443-444 (2nd Dept, 1985); *Colon v. National Mut. Fire Ins. Co.*, 211 AD2d 579, 621 NYS2d 608 (1st Dept., 1995); *Friedman v. Allcity Inc. Co.*, 118

AD2d 517, 500 NYS2d 124 (1st Dept., 1986).

The certificates of bulk mailing from the United States Postal Service merely stated that certain numbers of items were mailed but do not disclose to whom those items were addressed. The affidavits stated that the mailings were made by mailing services, but there were no affidavits from persons working for the mailing services showing to whom and to what addresses the mailings were actually made. The City's Affidavits submitted in opposition did not address these defects. Accordingly, Supreme Court should be reversed.

**C. Appellant was Denied Due Process Because the City Failed to Serve Appellant with a Copy of the Judgment, thus Denying Appellant the Opportunity to Redeem**

There is no dispute that the City failed to serve Appellant with a copy of the judgement of foreclosure. Had Appellant received a copy of the judgment, it would at least have had the opportunity to redeem the property, as required by the terms of the judgment.

In *Orange County Commissioner of Finance v. Helseth*, 24 Misc3d 204, 210, 875 NYS2d 754, 760 Sup Ct., 2009), aff'd 73 AD3d 1053 (2nd Dept, 2010), the Court held:

> Notice of a right to redeem one's property from the municipality into which title vests following a tax lien foreclosure sale enjoys constitutional procedural due process protection [citations omitted].

Admin. Code § 11-412.1 (d) provides in pertinent part that owners of affected properties have the right to redeem or enter installment agreements with the Commissioner of Finance. Had the City served Appellant with a copy of the judgment together with a notice of entry, Appellant would have been aware of the expiration date of its right to redeem the property by either payment to the Commissioner of Finance of the judgment, or by request an installment agreement. Without this knowledge, the right to redeem is illusory. The failure of the City to make sure that the notice of foreclosure was properly addressed to Appellant was further exacerbated by the failure to notify Appellant that the installments agreements it had entered into with the City were being rebuked by the City; and by the failure of the City to serve Appellant with a copy of the judgment.

Appellant was deprived of the opportunity to redeem the property by payment or an installment agreement; and was also deprived of the opportunity to apply to the City for the release of the City's interest in the real property.

## POINT III

## THE CITY'S NEGLECT TO INFORM APPELLANT THAT IT HAD REPUDIATED THE INSTALLMENT AGREEMENTS WAS GROSSLY IN BAD FAITH; ACCORDINGLY, THE CITY SHOULD BE ESTOPPED

Although the doctrine of equitable estoppel may not be invoked to prevent a governmental agency from discharging its statutory duties, it may be nevertheless be invoked to prevent manifest injustice. In *Bender v. NYC Health and Hospitals Corp*., 38 NY2d 662, 668, 345 NE2d 561, 564, 382 NYS2d 18, 21 (1976), the Court held in pertinent part as follows:

> We believe that where a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice, that subdivision should be estopped from asserting a right or defense which it otherwise could have waived.

In the instant case, Appellant was lulled by the City acting through its agency, DEP, into the reasonable conclusion that the installment agreements were binding and resolved the water and sewer arrears. As a result of having been misled, Appellant did not satisfy the arrears prior to the execution of the deed by the DOF, or seek another installment agreement pursuant to Admin. Code § 11-412.1 (d).

Appellant was further victimized by the City's bureaucratic confusion created solely by the City, through its own agency. This failure was compounded by the neglect of the City to notify Appellant that the agreements had been unilaterally rebuked by the City.

In *Landmark Colony at Oyster Bay v. Board of Sup'rs*, 113 AD2d 741, 493 NYS2d 340 (2nd Dept., 1985), the Court concluded that the plaintiff was a victim of bureaucratic confusion and deficiencies and applied the principle of equitable estoppel against a governmental agency.

The *Landmark Colony*, supra, Court found in pertinent part as follows:

> Thus, the doctrine of equitable estoppel should apply to preclude imposition of the penalty in this case. It is settled that a municipality or other governmental subdivision may be estoppel where its wrongful or negligent conduct induces a party relying thereon to change his position to his detriment (*Bender v New York City Health & Hosps. Corp*., 38 NY2d 662, 668; see also, *La Porto v Village of Philmont*, 39 NY2d 7, 12). Although estoppel should not be invoked against governmental entities in the absence of exceptional circumstances (*Luka v New York City Tr. Auth*., 100 AD2d 323, 325, aff'd 63 NY2d 667), we have not hesitated to do so where a municipality's misleading nonfeasance would otherwise result in a manifest injustice (*Matter of 1555 Boston Rd. Corp. v Finance Administrator of City of N.Y.*, 61 AD2d 187, 192).

Recently, in *Matter of Emporium Mgt. Corp v. City of New York*, 121 AD3d

981, 995 NYS2d 127 (2nd Dept., 2014), the Court reaffirmed that the principle of equitable estoppel may be invoked against governmental agencies. It pertinent part it held:

> [A]lthough estoppel should not be invoked against governmental entities in the absence of exceptional circumstances, we have not hesitated to do so where a municipality's misleading nonfeasance would otherwise result in a manifest injustice" (Landmark Colony at Oyster Bay v Board of Supervisors of County of Nassau, 113 AD2d 741, 744, 493 NYS2d 340 [1985] [citation omitted]). "To establish estoppel, the misconduct of the public agency must have induced justifiable reliance by a party who then changed his position to his detriment" (Matter of [**130] County of Orange [Al Turi Landfill, Inc.], 75 AD3d 224, 238, 903 NYS2d 60 [2010]; see Bender v New York City Health & Hosp. Corp., 38 NY2d 662, 668, 345 NE2d 561, 382 NYS2d 18 [1976]; Landmark Colony at Oyster Bay v Board of Supervisors of County of Nassau, 113 AD2d at 744).

The facts of *Matter of Emporium Mgt. Corp v. City of New York*, *supra*, are strikingly similar to the instant case. In *Matter of Emporium*, the owner, Emporium, entered into an installment agreement with the City in July 2011. Notwithstanding this, the City conveyed the owner's property to Neighborhood Restore on September 23, 2011. The City cancelled the agreement on August 16, 2011, but never informed the owner.

The Court found that the City's "failure to contact Emporium once it

determined that the installment agreements would not be honored constitutes misleading conduct."

The Court in *Matter of Emporium Mgt. Corp* went on to explain:

> Moreover, the city respondents maintained their silence during a period of time when action could have made a difference to Emporium (cf. Dorce v United Rentals N. Am., Inc., 78 AD3d 1110, 1111, 915 NYS2d 79 [2010]). Had the city respondents notified Emporium on August 16, 2011, of the cancellation of the installment agreements, Emporium would have had the opportunity—up until September 23, 2011, the date on which the Commissioner of Finance deeded the properties to Neighborhood Restore—to seek discretionary relief from the City, notwithstanding the fact that more than four months had passed from the date of entry of the judgment of foreclosure (see Administrative Code of City of NY § 11-424 [g]). Had such relief been granted, Emporium could have redeemed its properties upon payment in full of the tax arrears and other fees (see id.).

*Matter of Emporium Mgt. Corp. v City of New York*, 121 A.D.3d 981, 984, 995 N.Y.S.2d 127, 130, (2nd Dept., 2014).

In the instant matter, in reliance upon the agreements with DEP, Appellant did not redeem its property by paying the arrears in full or seeking relief under the Admin. Code § 11-412.1 (d). By disregarding its own agreement and failing to notify Appellant that the agreements were no longer valid, and then conveying the property to Neighborhood Restore, the City deprived Appellant of its property and

its shareholders of their home and proprietary interest. This is manifestly unfair and unconscionable, warranting the application of the doctrine of equitable estoppel.

In rejecting Appellant's equitable estoppel arguments, Supreme Court held that Appellant also owed real property taxes. (R11). But as previously demonstrated, the putative real property taxes the Court cites, were not "tax liens" subject to in rem foreclosure.

## POINT IV

### THE CONVEYANCE OF TITLE TO THE PROPERTY TO NEIGHBORHOOD RESTORE WAS CONTRARY TO THE COURT'S JUDGMENT AND THE ADMINISTRATIVE CODE; IT IS THEREFORE INVALID AND SHOULD HAVE BEEN SET ASIDE

On the same day the City conveyed title to Neighborhood Restore, it entered into a side agreement, demonstrating that the transfer of title was not in fee simple absolute, and was not authorized by either the Administrative Code or the December 1, 2017 default judgment of foreclosure. The transfer of title is therefore a nullity, and Supreme Court erred in not so ruling.

Under Admin. Code § 11-412.1, the City may convey title to affected properties. Admin. Code § 11-412.1 (c) specifies the type of full and complete title

which the Commissioner of Finance shall convey to the third party providing that upon the execution of the deed, the "city or the third party shall be seized of an estate in fee simple absolute in such land..."

The December 1, 2017 default judgment, in accordance with the provisions of Admin. Code § 11-412.1 (c), provides as follows:

> ".. that upon the execution of said deed or deeds to the City or to a third party ..., the grantee shall ... be seized of an estate in fee simple absolute ... [emphasis supplied].

(R409-433).

The relevant portions of the Third Party Transfer Agreement, demonstrate that the estate conveyed to Neighborhood restore was much less than fee simple absolute. (R546-552).

The restrictions contained in the Third Party Transfer Agreement with Neighborhood Restore make clear that the title granted to Neighborhood Restore was not fee simple absolute, but fee simple subject to several conditions subsequent. At the time that title was conveyed to Neighborhood Restore, the City reserved the right of reacquisition. The condition was a demand by the City. The City retained a future estate in itself as defined in EPTL § 6-4.6, which provides as follows:

> A right of reacquisition is the future estate left in the creator or in his successors in interest upon the

> simultaneous creation of an estate on a condition subsequent.

The deed to Neighborhood Restore did not vest fee simple absolute title in Neighborhood Restore upon the execution of the deeds as required by the Administrative Code and the judgment of foreclosure. Only after the passage of three years would the right of reacquisition by the city lapse and the estate of Neighborhood Restore ripen into an estate in fee simple absolute.

The Administrative Code and the judgment of foreclosure both required that title in fee simple absolute be conveyed to the grantee within eight months of the entry of the judgment of foreclosure. Accordingly, the deed to Neighborhood Restore is invalid and should have been set aside.

## CONCLUSION

For the reasons given above, this Court should reverse Supreme Court's Order; vacate the default judgment; set aside the deed conveying Subject Property, 1600 Nelson Avenue, Bronx, New York, to Neighborhood Restore should be set aside; and grant such other and further relief as may be just and proper under the circumstances.

Dated: New York, New York
December 6, 2020

Respectfully Submitted,

**HIMMELSTEIN, MCCONNELL, GRIBBEN, DONOGHUE & JOSEPH LLP**

Serge Joseph
By: ______________________________
Serge Joseph, Esq
15 Maiden Lane, 17th Floor
New York, New York
Tel: (212) 349-3000
E-mail: sjoseph@hmgdjlaw.com
Attorneys for Defendant-Appellant
1600 Nelson Avenue Development Fund Corp

# PRINTING SPECIFICATIONS STATEMENT

I hereby certify pursuant to 22 NYCRR 1250.8(j) that the foregoing brief was prepared on a computer using Microsoft Word.

Type. A proportionally spaced typeface was used, as follows:

Name of Typeface: Times New Roman Point size: 14

Line spacing: Double

Word Count. The total number of words in this brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, proof of service and this Statement is 13,026.

Dated: New York, New York
December 6, 2020

HIMMELSTEIN MCCONNELL GRIBBEN
DONOGHUE & JOSEPH LLP
Attorneys for Appellant-Defendant
1600 Nelson Avenue Housing Development
Funding Corporation

*Serge Joseph*

______________________________

Serge Joseph, Esq
15 Maiden Lane, 17th Floor
New York, New York 10038
(212) 349-3000

## STATEMENT PURSUANT TO CPLR § 5531

# New York Supreme Court

## Appellate Division—First Department

IN REM TAX FORECLOSURE ACTION NO. 52
BOROUGH OF BRONX
SECTIONS 9, 10, 11, 12, 14, 15 and 16
TAX CLASSES 1 AND 2.

THE CITY OF NEW YORK,

*Plaintiff-Respondent,*

– against –

1600 NELSON AVENUE HOUSING DEVELOPMENT FUND CORPORATION,

*Defendant-Appellant,*

– and –

NEIGHBORHOOD RESTORE HOUSING DEVELOPMENT FUND CORPORATION,

*Non-Party-Respondent.*

1. The index number of the case in the court below is 40000/15.

2. The full names of the original parties are as set forth above. There have been no changes.

3. The action was commenced in Supreme Court, Bronx County.

4. The action was commenced on or about July 7, 2015 by filing of a Notice of Foreclosure. No party has filed an answer.

5. The nature and object of the action involves tax foreclosure.

6. This appeal is from the Decision and Order of the Honorable Ben R. Barbato, dated May 31, 2019, and entered on July 9, 2015, which denied Respondent's Motion to Vacate Default, Set Aside Transfer of Title, Leave to Answer and Leave to Satisfy Tax Lien.

7. This appeal is on the full reproduced record.